# SAMUEL E. LADDON *v.* ROBERT F. WHITTLESEY

[No. 56, September Term, 1979.]

*Decided November 6, 1979.*

The cause was argued before LOWE, MASON and WILNER, JJ.

*Charles M. Chadwick* for appellant.

*James L. Baer,* with whom were *Spriggs, Cromwell, Myers, Nicholson & Spire, P.A.* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

—prologue—

The Uniform Partnership Act, Md. Code, Corps. & Assocs. Art., Title 9, like most uniform acts, was intended to anticipate problems and simplify solutions within defined areas. Subtitle 6 anticipated the problems of Dissolution and Winding Up of partnerships. Section 9-609 anticipated the problems of applying partnership property upon dissolution in either instance when a surviving partner desires to continue the business with the same name or when the business is both dissolved and terminated.

If dissolution is mutually agreed upon, each partner may have the partnership property applied to discharge its liabilities and the surplus applied to pay in cash the net amount owing each partner. § 9-609 (a). If the dissolution is not mutual and amicably agreed upon; but caused by the wrongful conduct of a partner, the innocent partner is entitled not only to his net share of the surplus after liabilities, but also to damages caused by the wrongdoer. § 9-609 (b).

The innocent partners are given a conditional option either to continue the business or to wind it up and terminate it. If they desire to continue the business in the same name, they must, among other things, pay the partner who wrongfully causes the dissolution the value of his interest in the partnership (§ 9-609 (b) (2)), as of the date of dissolution (§ 9-614), less damages recoverable as abovementioned (§ 9-609 (b) (1) (ii)). If the business is not continued, the innocent partner has the right to wind up the partnership affairs, § 9-608; nonetheless, the partner who caused the dissolution wrongfully is entitled to be paid in cash the net amount of the surplus after repayment of liabilities as any other partner pursuant to § 9-609 (a), although his share is

subject to diminution for whatever damages were caused by his wrongful breach of the partnership agreement causing dissolution, § 9-609 (b) (3) (i).

While all partnership rights to an accounting of any partner's interest, investment or wrongful cause, accrue at the date of dissolution, § 9-614 and see § 9-609 (b) (2), dissolution does not terminate the partnership. The partnership continues until winding up of partnership affairs is completed, § 9-601. Only in the best of all possible partnership worlds will dissolution and termination coincide, but more often than is desirable a partnership will begin to disintegrate commensurate with a developing animosity between partners. At some point during that period, dissolution may be caused intentionally or unconsciously by wrongful conduct of a recalcitrant partner, but the "partnership" business limps on. The partners now openly antagonistic may be unable to agree on anything, including whether to carry on or dissolve; whether to wind up completely or have some partners remain and continue the business; or when and how to accomplish any of this.

When partnership affairs reach this stage, statutes do not provide easy answers, and even though the Uniform Act tries to anticipate such exigencies, the court is left with the responsibility to decree a dissolution as the solution. By the time the partners are resolved to seek court dissolution as a last resort, much damage has been done, and more may occur before termination because the date the court determines dissolution occurred and the final termination may affect distribution pursuant to § 9-611. Perhaps, recognizing that there will be times when this arms length period between partners will require business to be conducted for the preservation of the business partnership assets, the Act has provided among its delineation of rights and duties of partners in § 9-401 that:

> "(2) The partnership must indemnify every partner in respect of payments made and personal liabilities reasonably incurred by him in the ordinary and proper conduct of its business, or for the preservation of its business or property."

22

In addition thereto,

> "(3) [a] partner, who in aid of the partnership makes any payment or advance beyond the amount of capital which he agreed to contribute, shall be paid interest from the date of the payment or advance."

Unless there is some agreement for salary for specified services among or between the partners,

> "(6) [n]o partner is entitled to a remuneration for acting in the partnership business, except that a surviving partner is entitled to reasonable compensation for his services in winding up the partnership affairs."

—facts—

When these pertinent sections of the Act are excised, dissolution of a partnership seems formulized. But when issues are isolated in a dissolution case that has dragged on for four years, replete with the digressions of individuals' internal infighting, the panoramic partnership perspective may be distorted; the partnership purpose of dissolution digressed from; and the statutory formula misapplied. Such is the case of Laddon and Whittlesey, trading as Woodbine Auto Wreckers and Junk Company.

The case at bar, from the Circuit Court for Montgomery County, unfolded in serial-like sequences when appellant Samuel E. Laddon and appellee Robert F. Whittlesey found that their relationship as partners in the junk business was foundering. The two had purchased this business for $75,000, of which the seller took back a $50,000 deed of trust. The parties then borrowed $50,000 from a bank to be used as capital. These indebtednesses, which were to be repaid in equal periodic payments by the partners, are at the crux of this appeal, although the judge and the parties seem to have lost sight of that fact.

The origin, brief life, and ultimate demise of this partnership must be searched for in pleadings, statements and testimony from hearings on various motions made to

compel payment of partnership obligations, extracts of transcripts of unexplained proceedings, stipulations and agreements of the parties before a master-auditor and his reports, hearings on motions to compel a sale, requests for contribution, etc. Even the briefs were of little help in this regard because the parties elected to address the issues narrowly in isolation rather than view the whole picture. We will not respond in that manner because to do so tends to lead to the same error as that committed by the court below.

The primary problem appears to be that the trial judge tried to decide the dollar dispute between the parties without determining the fate of the business. He addressed the personal dispute between the parties rather than the dissolution of the partnership. Although he did determine dissolution had occurred on one date, his accounting appears to have envisioned a date over a year later.

—the partnership—

It is accepted that the partnership agreement originally comprehended equal contributions and equal rewards. Laddon testified that there were definite terms agreed upon, however, as to the respective duties of the partners. It was Whittlesey who detailed them in some degree. Whittlesey was to be at the job, "when [he] could", one half day a week — presumably without salary. Laddon, however, was to assume a far greater management role for which he would be salaried, although even his time was flexible:

> "When we went into the business, Laddon had closed his other business, was not operating it and we discussed a salary for him to oversee the operation of the business. He wanted two hundred dollars a week and I told him that wasn't enough. We were friends. We settled on three hundred dollars a week. He said he would charge the business for the time he spent in the business if he spent a full week; he would get paid the three hundred dollars. If he spent less than that, he would scale it down."

During the summer and early fall of 1973 this imbalance of responsibility caused Mr. Laddon to become disenchanted.

"Mr. Whittlesey didn't seem to have any time to devote to the business in accordance with what my understanding of what he was going to do for the business at the inception of the partnership. He wasn't doing it. I was very unhappy with the fact that I had to shoulder the entire responsibility and make most of the decisions regarding the operation of the business and try to be in a number of places at the same time."

A partnership meeting was scheduled by Mr. Laddon

"[t]o either refresh our arrangements regarding the partnership or to enter into some other agreement, including that of selling the business."

The meeting did not come to pass because of a heart attack suffered by Mr. Laddon. He was unable to resume his duties until approximately April of 1974, when he would participate

"two or three hours a day, sometimes four or five hours a day, depending on how [he] felt."

Even this did not last and Laddon's disenchantment culminated in his realization

"[t]hat Mr. Whittlesey and I were hopelessly at odds over the operation of the business and that I couldn't see any possibility of any sort of reconciliation or continuation of the business."

Whittlesey, on the other hand, picked up the reins while Laddon was indisposed.

"When he was in the hospital I talked to him by phone and he was concerned about the business at that time.

Q Was there anything he wanted you to do with respect to the business while he was in the hospital?

A No, he wanted me to keep it going. There was not specific duties set out."

Keep it going he did presumably until June of 1974 when Laddon had resumed some of his responsibilities.

"A He was there off and on from the time he recuperated from his illness which I don't know the date of that. He was there in the spring and early summer.

Q Of 1974?

A That is correct."

Laddon then struck the final blow:

"Q Did there come a time when Mr. Laddon no longer would participate in the on-going business of Woodbine Auto Wreckers?

A Yes. I don't know the date.

Q Approximately, when did that occur?

A In June 1974. He told me he was not going to put any more money into the business. I think that is about the extent of it."

—the suit to dissolve—

On September 6, 1974, appellee Robert F. Whittlesey filed a bill of complaint to dissolve the partnership, praying further an accounting by Laddon, that Laddon be enjoined from contracting on behalf of the partnership, and that he, Whittlesey, be permitted to continue the business of the Company after dissolution. Four years later, on December 13, 1978, the court passed the following Memorandum and Order:

"The Court has previously concluded that the partnership in this case was dissolved on June 15, 1974. The Court has had numerous hearings and has reviewed the several memoranda submitted by counsel. The following Order is based on a thorough review of all of this data and the presentations of counsel and the ultimate conclusion that *the dissolution of the partnership was caused by the wrongful actions of the defendant, Samuel E. Laddon.*

26

It is, by the Circuit Court for Montgomery County, Maryland, on this 13 day of December, 1978,

ORDERED, that a *judgment* is entered *in favor of* the plaintiff, Robert F. *Whittlesey, against* the defendant, Samuel E. *Laddon, in the sum of Nine Thousand Five Hundred Sixty-one Dollars and Eighty-seven Cents* ($9,561.87) with interest; and it is further

ORDERED, that the defendant, Samuel E. *Laddon, shall pay unto* the plaintiff, Robert F. *Whittlesey,* the sum of *Eleven Thousand One Hundred Eighty Dollars* ($11,180.00) *as and for his attorney's fee; One Thousand Fifty Dollars* ($1,050.00) *as and for his appraisal fees;* and *Three Hundred and Fifty Dollars* ($350.00) *as and for his accountant's fee;* and it is further

ORDERED, that prior to any other disbursements that the partnership assets shall be expended to secure total payment of the existing first trust on the real property in Carroll County, Maryland; and it is further

ORDERED, that the next priority payment shall be to the plaintiff, Robert F. Whittlesey, in a sum sufficient to defray the judgments entered hereinabove; and it is further

ORDERED, that the next priority in payment shall be a distribution of the capital contributions made by the plaintiff and defendant and thereafter the net profits, if any, shall be distributed to the plaintiff and the defendant, and it is finally

ORDERED, that the defendant, Samuel E. Laddon, shall pay the costs of these proceedings." (emphasis added).

Appellant has asked five questions which are abstractly meaningless, but contextually indicate error in the court's conclusions. Perhaps during the four years between commencement and conclusion, the court was so often carried off in tangents that it lost direction in reaching its

conclusions. The parties did little to help keep it on course. Indeed, we frequently found the briefs and issues raised and responded to on appeal more confusing than clarifying.

Regrettably, the court also declined the opportunity to assist our review by clarification. After receiving the Memorandum and Order of December 13, 1978, appellant requested by letter some explanation of the result reached:

> "My client desires that I entertain an appeal to the Special Court of Appeals, and I would appreciate your supplementing your Memorandum and Order of December 13, 1978, with an extended Findings of Fact and Conclusions of Law, in accordance with Maryland Rule 18(c) [sic]."

The court responded by a supplemental memorandum that when analyzed simply says, "it's in the record, you find it":

> "This Memorandum supplements the Court's Memorandum and Order of December 13, 1978, in accordance with Maryland Rule 18 (b).
>
> The findings and conclusions filed in my Memorandum and Order of December 13, 1978, were based upon the following:
>
> 1. The demeanor of the witnesses who gave testimony in the case.
>
> 2. The examination of the Special Master who was appointed in this case, and the report that he submitted to me.
>
> 3. The consideration of the exhaustive hearings held before this member of the Court.
>
> 4. The consideration of several items of evidence received at the various hearings.
>
> 5. The review of the most thorough memoranda of law submitted to the Court by counsel for both parties, and
>
> 6. The review of the proposed findings of fact and conclusions of law submitted by counsel for both plaintiff and defendant."

Again, appellant tried to find out how the result was reached:

"This will acknowledge receipt of your Memorandum of February 27, 1979.

I believe that Rule 18 (b) contemplates some disclosure of the facts found by the trial court and a brief discussion of law as applied to those facts so that the Appeals Court may properly evaluate the conclusions in your Memorandum of December 13, 1979 [sic].

I would appreciate your preparing such a memorandum so that the record before the Court of Appeals may be complete.";

and again appellant was denied it:

"I have your letter of March 6, 1979, a copy of which was delivered to the Honorable Joseph M. Mathias. I do not agree with your interpretation of Rule 18 (b). After the many hearings on motions; evidence; master's report; conferences; and memoranda of counsel, I am not going to burden this record with any further material."

Reversal may have been avoided had his honor provided us with his reasoning rather than leaving us to speculate; however, after thorough and repeated review of the record extract, we are unable to find aught to support his conclusions.

A painstaking review of the record extract revealed a singular agreement between the parties at the start of the case. Laddon's answer to Whittlesey's bill for dissolution concurred that the partnership be dissolved. However, Laddon objected to Whittlesey's continuation of the business and prayed that it be wound up and the assets disposed of at public sale. There followed substantial infighting of peripheral pertinence, the most significant of which was the submission to a master-auditor for the determination of the date of dissolution, to determine capital contributions and to report. The record discloses that by stipulation June 30, 1975 was used as a cut-off date to calculate the capital

contributions. The ultimate findings of the master-auditor, as testified and reported by him, disclosed that the capital contributions from the commencement in 1973 through June 30, 1975 were for

Whittlesey [1] — $34,911.21

and for

Laddon        — 15,787.46

providing an imbalance in Whittlesey's favor of $19,123.75. The court by order of April 2, 1976 adopted those findings. Were that imbalance distributed equally, as the testimony indicating an equal partnership reveals the parties intended, Laddon would have been indebted to Whittlesey in an amount equal to one-half of that difference, or $9,561.87. Since the court had adopted these findings we must conclude, in light of the subsequent order of December 13, 1978 provided, inter alia, judgment against Laddon in favor of Whittlesey in that precise amount, that the judge reached that figure by the same route we have followed here. This figure would have been meaningful in the overall accounting upon termination for purposes of distribution, and undoubtedly, if the date of dissolution had been found to be June 30, 1975, that much of the court's conclusion from an accounting view would have been correct, at least to indicate the respective capital contributions. However, in the same memorandum of April 2, 1976, in which he adopted the master-auditor's findings as to capital contributions — which had been based on the stipulated date of June 30, 1975 — the memorandum continued:

"It is further found that the date of the dissolution of the partnership would be June 15, 1974."

The question of appellant's capital contributions becomes important only in balancing out his equity in those assets. While he is liable to be debited for an imbalance in capital contributions for liabilities made prior to dissolution, it is obvious that he may not be forced to contribute to capital

---

1. A correction of $25 in the computations taken from the testimony has been accounted for here.

contributions for *"new"* liabilities made after that date. Significantly then, if.the "capital contributions" between the date of dissolution found to be June 15, 1974 and the June 30, 1975 date stipulated to the master-auditor, were solely for payments of a liability incurred for capital purposes prior to dissolution (which appears from the record as most likely but not certainly), appellant may be charged with his share of that continuing liability under § 9-607 (a) until the business is terminated (§ 9-601) — but only if the court has ruled that the business may *not* be continued as prayed for by appellee.

—continue or conclude—

Thus, the court must first determine whether it will accede to the wishes of appellee and permit him to continue the business, or, as first prayed by appellant, that the "partnership business be wound up and disposed of at public or private sale . . . ." This has not been definitely decided and is crucial to the disposition of the case. Although Whittlesey was "designated with the authority to conclude the affairs of the partnership" by order of May 11, 1977, he is not told, nor has he indicated how or when it is to be accomplished. We only know that, these two years later, the partnership business appears still to be in limbo.

Even assuming the court will again on remand determine that Laddon was the wrongful cause of dissolution as indicated in the December 13, 1978 order, if it is to be continued by Whittlesey, Laddon is nonetheless entitled to be paid the value of his interest effective the date of dissolution less damages for breach of the agreement. § 9-609 (b) (3) (ii). If the business is not to be continued by Whittlesey, Laddon is entitled to have the partnership property applied to discharge its liabilities and to have the surplus applied to pay in cash the net amount owing the partners, less any damages for dissolution caused by the wrongful breach. § 9-609 (b) (3) (i).

It would appear that termination of the partnership's business was the conclusion anticipated by the court without expressly so holding, when on May 11, 1977 it designated

Whittlesey as "the authority to conclude the affairs of the partnership." While that inferentially decides Whittlesey is not to be allowed to continue the business and Laddon's request to conclude was granted, the court should determine why the winding up partner has not, for two years, wound up the business and what the cause and consequences are of the delay.

Assuming, as we must, that the partnership is still in a state of being "wound up", the court must distinguish between debts incurred of a continuing nature prior to dissolution (such as the first trust on the property when purchased by them and the bank loan used as capital at commencement of their partnership) which continue to be obligations of the partners pursuant to § 9-607, and any new capital contributions (as for purchases of inventory, etc.) which may have been volunteered in anticipation of continuing the business after dissolution as prayed by appellee. Any new capital contributions would hardly be chargeable to the appellant even under § 9-401 (2). But if either partner was compelled to pay the liabilities incurred prior to dissolution to preserve the partnership assets, he is entitled to recover from the partnership whether designated as winding up partner or not. § 9-401 (2). Only if the partnership assets are insufficient to recompense him for these payments, is he entitled to recover from the other partner pursuant to that partner's obligation under § 9-611 (4).

On the other hand, if Whittlesey is to be permitted to continue the business as his own, even such prior incurred capital contributions and liability payments as he may have made after the date of dissolution should not be made Laddon's obligation. To do otherwise would be to benefit the continuing business and the surviving partner at the expense of the withdrawing partner.

A peripheral problem at which the record extract hints but provides little or no evidence to support, relates to the two primary liabilities of the partnership — the deed of trust and the bank note as indicated. According to recitations in a Request for Order for Contribution, payment has been made in full by Whittlesey (possibly as winding up partner) to the

bank pursuant to court order in another case. The deed of trust, on the other hand, has apparently been acquired by Jane E. Laddon (presumably appellant's spouse), who has by another court action obtained judgment for $4,253.31 against Whittlesey, who has had payment for half of that amount assessed against Laddon by third party action. Inferentially, as payments came due, Jane Laddon has sued Whittlesey, since the recitations indicate a second suit against appellant in the same amount was then pending.

Nothing in the record extract[2] indicates to us the source of funds from which Whittlesey paid off the bank note, nor do we understand why the district court entered judgment for Jane Laddon against Whittlesey (and he for contribution against Laddon), presumably as an indebtedness evidenced by a note of the partners secured by a deed of trust of their partnership property. These are matters which must be considered in the winding up and distributive process.

One final concern raised by appellant is also one with which we agree that the court erred absent some adequate explanation. The language of the order that Laddon pay "unto the plaintiff, Robert F. Whittlesey ... *his* attorney's fee;" *"his"* (emphasis added) appraisal and accountant fees, and the fact that the bills were not submitted as evidence in the case or any phase of it, but were simply appended to memorandums submitted at conclusion, compel us to remand for a proper introduction of these bills to assure evidentiarily that they were liabilities properly incurred in the conduct of business by Whittlesey on behalf of the partnership or for the preservation of its business or property. § 9-401 (2). If that is not so, appellant is correct in contending that he is not compelled to pay attorney's fees or litigation expenses even to a successful litigant (a status which our reversal seriously jeopardizes). *Empire Realty Co. v. Fleisher,* 269 Md. 278 (1973).

---

2. And we are not compelled to comb the record itself, passing it from judge to judge, seeking matter that is required by rule to be extracted for our review. Md. Rule 1028 b 1; see Eldwick Homes Ass'n v. Pitt, 36 Md. App. 211 (1977).

—epilogue—

Appellee's Statement of the Case indicates that the sums were incurred by him as "winding up partner", which, while a likelihood, needs evidentiary support especially since the original suit for dissolution was filed by him September 6, 1974, and his designation by the court as winding up partner was received by him some three years later, on May 11, 1977. Furthermore, testimony disclosed evidence of other litigation between the parties wherein it appeared same counsel did or may have represented appellee. The court should have ascertained and charged the partnership only with the liabilities incurred by the partnership or on its behalf by appellee. Laddon would be responsible, if at all, only if it were a justifiable partnership liability which the partnership assets cannot pay upon distribution pursuant to § 9-611.

Appellee's reliance here upon § 9-401 (6) and (2) of the Act is misplaced. This is not an award of compensation to the winding up partner pursuant to § 9-401 (6), nor is it justified in the records as a partnership indemnification of a partner "for the preservation of its business or property." § 9-401 (2). It is expressly set forth in the order as *appellee's attorney's fee,* etc. No reference is made to Laddon's share thereof, which itself would only become due as we have said, if the partnership assets are inadequate to pay its justified debts.

It appears that despite four years having elapsed since this case commenced, the court was premature in issuing its final judgment before deciding the fate of the partnership business which appears from the record extract to be in a state of purgatory still awaiting the expiation of its partners' sins. We therefore reverse that judgment and remand for further proceedings to be held and concluded in light of our observations in this opinion and such other portions of the Uniform Partnership Act as may become relevant. In addressing the problems we have highlighted, or others which may appear, the court is not bound to the record as it exists but is free to proceed as will best enlighten it. It may require further argument, briefs, hearings or evidence as it may deem necessary to provide the foundation for its resolution

of this seemingly simple controversy immensely complicated by the development of personal animosities between the partners. As pointed out by the trial judge in declining to compel a proposed sale over two years after the bill for dissolution was filed,

> "[i]t is patently clear that neither party is willing to alter their position, but prefer to watch the only real asset dissipate. So be it."

That sentiment is so strongly supported by the record, it may be appropriate to add an appellate "amen" as well.

> *Judgment reversed.*
> *Case remanded for further proceedings as indicated by this opinion.*
> *Costs to be apportioned equally between the parties.*