961 A.2d 629

Joseph M. DELLA RATTA et al.

v.

Edward J. DYAS, Jr.

No. 2127, Sept. Term, 2007.

Court of Special Appeals of Maryland.

Dec. 3, 2008.

346

James E. Carbine, Baltimore, for Appellant.

David M. Sheehan (Michael E. Blumenfeld, Brown & Sheehan, LLP on the brief), Baltimore, for Appellee.

Panel: JAMES R. EYLER, WOODWARD and LAWRENCE F. RODOWSKY (retired, specially assigned), JJ.

LAWRENCE F. RODOWSKY, Judge, retired, specially assigned.

The litigation underlying this appeal arose out of the dispute between the two equal owners of two hotels and a condominium in Ocean City, Maryland. The appellee, Edward J. Dyas, Jr. (Dyas), was the plaintiff below. One of the appellants, Joseph M. Della Ratta (Della Ratta), was a defendant below. We shall refer to Della Ratta and Dyas collectively as "the Developers."

The earliest of their projects was the Best Western Sea Bay Inn (Sea Bay or the Old Hotel), located at 6007 Coastal Highway, which opened in 1988. The Developers' vehicle for this project was Spa Motel General Partnership (Spa), that was formed in 1987. Originally, Spa was comprised of three partners. Before Sea Bay was completed, Dyas bought out the third partner so that he and Della Ratta thereafter each held a fifty percent interest in Spa.

The Developers' second project was a condominium, Maresol, located at 5501 Coastal Highway. Their vehicle for that project was Bay View Condominiums, LLC (Bay View), formed in 2002, in which the Developers had equal interests. Maresol was completed in 2004. Construction financing for

Maresol was furnished by Severn Savings Bank FSB (Severn Bank), a defendant below, but not one of the appellants.

The Developers' third project was Best Western Hotel and Suites (the New Hotel), located at 5501 Coastal Highway. It opened in 2006, more than one year after the instant litigation had been instituted by Dyas. Spa was the entity in which the Developers placed the New Hotel project.

Each of the projects was built by a construction company solely owned by Della Ratta, Della Ratta, Inc. (DRI). The two hotels were managed for Spa by Commercial Management Company (CMC), also wholly owned by Della Ratta. DRI and CMC were defendants below and are appellants.[1]

Dyas instituted this action on January 10, 2005, in the Circuit Court for Anne Arundel County, with a request for a temporary restraining order against calls for capital issued by Della Ratta for Spa. In overview, Dyas's theory of the case was that Della Ratta was attempting wrongfully to squeeze out Dyas from Spa and Bay View. Under Dyas's analysis, Della Ratta's strategy in the general partnership, Spa, was to call for a very substantial capital contribution to pay claims by CMC for alleged advances made by it for operational expenses of Sea Bay and to pay claims by DRI for New Hotel construction costs. Dyas contended those calls were unauthorized because, *inter alia,* the underlying claims could not be substantiated and the partnership agreement required the Developers first to seek a commercial loan before resorting to calls for additional capital. To the extent that the claims were authorized, Dyas alleged that the squeeze out strategy sought wrongfully to deprive him of funds from Bay View with which to satisfy the calls in Spa.

With respect to the LLC (Bay View), Dyas's theory of Della Ratta's squeeze out strategy involved two ploys. First, Della Ratta sought personally to purchase the loan from Severn

---

1. An amendment by interlineation converted a number of the counts in Dyas's complaint into derivative claims and added Spa and Bay View as beneficial plaintiffs and as nominal defendants.

Bank and obtain from it an assignment of the security instrument, on which Della Ratta then would foreclose, so that he could buy in at the foreclosure sale. Severn Bank, however, would not assign the loan to Della Ratta. Dyas further alleged that, as an alternate squeeze out strategy, Della Ratta wrongfully refused to sell condominium units in Maresol. The resulting illiquidity would deprive Bay View of the cash needed to repay Severn Bank, so that Della Ratta could buy in Maresol at a foreclosure sale conducted by Severn Bank. The illiquidity would also deprive Dyas of the funds to pay any authorized capital calls in Spa.

For ten days between June 5 and June 19, 2006, the case was tried on the merits in Anne Arundel County. That circuit court, in an oral opinion rendered on June 28, 2006, concluded that Dyas had proved these allegations. By an amended interlocutory judgment dated August 4, 2006, the Circuit Court for Anne Arundel County granted the relief set forth below. It

• transferred the action to the Circuit Court for Montgomery County, effective August 7, 2006, for further proceedings, because Montgomery County was the location of the principal offices of Spa and Bay View;

• ordered, by agreement of the Developers, sale of the remaining ten units in Maresol;

• permanently enjoined Della Ratta from taking unilateral action affecting ownership interests in Spa and Bay View;

• declared that Della Ratta was not authorized unilaterally to manage Bay View;

• declared that the Bay View operating agreement did not permit any member, or any entity owned or controlled by any member, to charge interest on loans made to Bay View;

• declared that the partnership agreement for Spa did not authorize Della Ratta unilaterally to manage that entity;

• declared void the capital call notices issued by Della Ratta;

• ordered an accounting at the sole expense of Della Ratta and CMC;

• found that CMC was indebted to Spa for $579,589, plus interest, based on overcharges by CMC under an equipment lease from it to Spa;

• found that DRI was entitled to repayment of a construction loan to Spa in the amount of $758,000, plus interest;

• found that Della Ratta was entitled to repayment of an advance by him to Spa of $500,000, plus interest;

• found that Della Ratta contributed $500,000 of capital to Spa;

• found that the contract between Spa and DRI for construction of the New Hotel was at a fixed price of $3,280,000, beyond which the defendants were not entitled to reimbursement for purported loans or advances to Spa related to construction costs;

• found that the contract between Bay View and DRI for the construction of Maresol was at a fixed price which, with authorized change orders, totaled $5,613,438, beyond which the defendants were not entitled to reimbursement for any purported loans or advances to Bay View related to construction costs; and

• limited the auditor to an accounting based solely on exhibits at the trial.

Ultimate findings of the Circuit Court for Anne Arundel County were that it was "no longer reasonably practicable to carry on the business" of Spa or of Bay View and that Dyas "ha[d] proved to the Court's satisfaction facts sufficient for the Court to grant a dissolution" of each of those entities, "but that only the Circuit Court for Montgomery County has the subject matter jurisdiction to grant a dissolution." The court further ordered dissociation of Della Ratta as a partner in Spa.

The original record in the Anne Arundel County action, No. 02–C–05–102992BC, was filed in the Circuit Court for Montgomery County on August 25, 2006, and designated as Case

No. 274403 in the latter court. In addition, Chief Judge Bell designated the trial judge (Caroom, J.) to sit as a judge of the Circuit Court for Montgomery County. Orders for the dissolution of Spa and Bay View were entered by the Circuit Court for Montgomery County on March 20, 2007.

After two interim accounts and distributions, the auditor, in September 2007, submitted his final report. It was approved by the final judgment entered by the Circuit Court for Montgomery County on October 12, 2007.[2] From that judgment this appeal was noted.

Additional facts necessary to the resolution of the issues presented will be stated in the discussion of those issues.

Appellants present the following questions:

"1. Did the Trial Court have the subject matter jurisdiction to dissolve Bay View Condominiums, LLC, and judicially supervise the winding up of Spa Motel General Partnership?

"2. Did the Trial Court err by dissociating Joseph M. Della Ratta as a general partner of Spa Motel General Partnership based on his conduct in Bay View Condominiums, LLC?

"3. Did the Trial Court err by enjoining the December 10, 2004, capital calls for Spa Motel General Partnership based on the conduct of Joseph M. Della Ratta in Bay View Condominiums, LLC?

"4. Did the Trial Court err when it found that the parties formed an enforceable agreement to construct the Maresol Condominiums on a firm, fixed price basis?

"5. Did the Trial Court err by refusing to allow Joseph M. Della Ratta, the opportunity to introduce proffered exhibit L26 into the record before the court appointed auditor during the accounting phase of the case?"

---

**2.** None of the parties advises us of the ultimate net of the accounting.

## I. JURISDICTION/VENUE

### A. Background

While this action was pending in the Circuit Court for Anne Arundel County, Dyas, by his first amended complaint filed February 9, 2005, added counts requesting a dissolution of Spa and a dissociation of Della Ratta from Spa. Appellants filed an answer to the first amended complaint. In response to the averments of the counts requesting dissolution and dissociation, appellants raised no issue over proceeding in the Circuit Court for Anne Arundel County.

In November 2005, appellants moved to have the entire action transferred to the Circuit Court for Montgomery County. They contended that that court had exclusive subject matter jurisdiction over the action, by virtue of the requested dissolution of Spa and because Montgomery County was the location of the principal office of Spa. This argument was based upon the Maryland Revised Uniform Partnership Act (MRUPA), Maryland Code (1975, 2007 Repl.Vol.), § 9A–803 of the Corporations and Associations Article (CA). Subsection (a) of that statute provides:

"(a) *Participation and supervision.*—After dissolution, a partner who has not wrongfully dissociated may participate in winding up the partnership's business, but on application of any partner, partner's legal representative, or transferee, the circuit court for the county in which the principal office of the partnership is located, for good cause shown, may order judicial supervision of the winding up." [3]

---

3. The MRUPA, in CA § 9A–801, includes, in subsection (5), judicial determination among the events of dissolution of a general partnership. That subsection, however, does not reference the circuit court of the county in which the principal office of the partnership is located. Section 9A–801 in relevant part provides:

"A partnership is dissolved, and its business must be wound up, only upon the occurrence of any of the following events:

. . . .

"(5) On application by a partner, a judicial determination that:

"(i) The economic purpose of the partnership is likely to be unreasonably frustrated;

Initially, the circuit court (Manck, J.) mistakenly concluded that CA § 9A–803 had no application to Spa because it had been formed prior to the enactment of the MRUPA by Chapter 654 of the Acts of 1997, and because the prior general partnership statute's provisions, dealing with dissolution, had made no reference to the circuit court of the county of the principal office of the entity. The parties now agree that the MRUPA applies to this action.

Dyas, by his third amended complaint filed on May 15, 2006, added a count seeking the dissolution of Bay View. Defendants filed an answer to that pleading, in which they pled specially as a defense the absence of "subject matter jurisdiction" in the Circuit Court for Anne Arundel County. This legal position was based upon the Maryland Limited Liability Company Act (MLLCA) that had been enacted by Chapter 536 of the Acts of 1992 as Title 4A of CA. CA § 4A–903 provides:

> "On application by or on behalf of a member, the circuit court of the county in which the principal office of the limited liability company is located may decree the dissolution of the limited liability company whenever it is not reasonably practicable to carry on the business in conformity with the articles of organization or the operating agreement."

Comparable to CA § 9A–803, applicable to general partnerships, CA § 4A–904 provides:

> "(a) *In general.*—Unless otherwise provided in the articles of organization or the operating agreement, the remaining members of a limited liability company may wind up the affairs of the limited liability company.

---

"(ii) Another partner has engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with that partner; or

"(iii) It is not otherwise reasonably practicable to carry on the partnership business in conformity with the partnership agreement[.]"

"(b) *Judicial winding up.*—Notwithstanding the provisions of subsection (a) of this section, the circuit court of the county in which the principal office of the limited liability company is located, on cause shown after dissolution, may wind up the limited liability company's affairs on application of any member."

Throughout the proceedings, appellants maintained their position that the Anne Arundel County court lacked subject matter jurisdiction.

In this Court, appellants contend, with respect to Bay View, that the plain and unambiguous meaning of CA § 4A–903 is that the only court with subject matter jurisdiction to hear and decide an action for the dissolution of a limited liability company is the circuit court of the county of that company's principal office. Placing similar reliance on the allegedly plain language of CA § 9A–803, appellants submit that, here, only the Circuit Court for Montgomery County could supervise the winding up of Spa. These results flow, appellants argue, because the statutes address an "application" for dissolution or for judicial supervision of winding up. As appellants see it, although the orders for dissolution were entered by the Circuit Court for Montgomery County, they were void because proceedings underlying those orders had already taken place in Anne Arundel County pursuant to Dyas's "application" there.

Dyas submits that CA §§ 4A–903 (MLLCA) and 9A–803 (MRUPA) are venue provisions and that any venue privilege has been waived by appellants' failure to comply with Maryland Rule 2–322(a) that requires improper venue to be raised by a motion to dismiss, filed before answer.[4] Alternatively, Dyas contends that it was the Circuit Court for Montgomery County and not the Circuit Court for Anne Arundel County that ordered dissolution of Bay View and supervised the winding up of Spa.

---

4. Appellants do not argue that, *if* CA §§ 4A–903 and 9A–803 are venue provisions, there has been no waiver.

## B. Discussion—Venue

■ Appellants' argument uses "the term 'jurisdiction' fundamentally, to indicate the actual power, rather than the propriety, of the Circuit Court [for Anne Arundel County] acting in such matters." *In re Application of Kimmer*, 392 Md. 251, 254 n. 1, 896 A.2d 1006, 1008 n. 1 (2006). *See also Fooks' Ex'rs v. Ghingher*, 172 Md. 612, 624, 192 A. 782, 787 (1937) ("There is a wide distinction between the lack of jurisdiction to decide a given case, and the improper or irregular exercise of a power which, while within the general jurisdiction of the court, under its established practice, is not applicable to the facts in respect to which it is exerted."). "Jurisdiction of the subject-matter means not simply the particular case to which the attention of the court is directed, but the class of cases to which it belongs, and over which the authority of the court extends." *Id.* at 620, 192 A. at 786.

■ "Whether a court has fundamental jurisdiction, i.e., the power, to decide a matter, must be determined by looking to 'the applicable constitutional and statutory pronouncements[.]' " *Board of Nursing v. Nechay*, 347 Md. 396, 405, 701 A.2d 405, 410 (1997) (quoting *Kaouris v. Kaouris*, 324 Md. 687, 708, 598 A.2d 1193, 1203 (1991), in turn quoting *First Federated Commodity Trust Corp. v. Commissioner of Securities for Maryland*, 272 Md. 329, 334, 322 A.2d 539, 543 (1974)). *First Federated Commodity Trust* described the jurisdiction of the circuit courts, saying:

"The circuit courts of this State ... are courts of original general jurisdiction, Maryland Const., Art. IV, §§ 1, 19, 20 and, therefore, they may hear and decide all cases at law and in equity other than those which fall within the class of controversies reserved by a particular law for the exclusive jurisdiction of some other forum."

*Id.* at 335, 322 A.2d at 543.

Constitution, Article IV, § 1 vests the judicial power of this State

"in a Court of Appeals, such intermediate courts of appeal as the General Assembly may create by law, Circuit Courts, Orphans' Courts, and a District Court."

Constitution, Article IV, § 19 establishes the eight judicial circuits of the circuit courts.

Constitution, Article IV, § 20(a) addresses the jurisdiction of the circuit courts and provides:

"(a) There shall be a Circuit Court for each County and for Baltimore City. The Circuit Courts shall have and exercise, in the respective counties, and Baltimore City, all the power, authority and jurisdiction, original and appellate, which the Circuit Courts of the counties exercised on the effective date of these amendments, and the greater or lesser jurisdiction hereafter prescribed by law."

Appellants' challenge to the subject matter jurisdiction of the Circuit Court for Montgomery County in ordering the dissolution of Bay View is premised on their construction of CA § 4A–903. The cardinal rule of statutory interpretation is to ascertain and effect the legislative intent. The process begins with the statutory language which will be given its plain meaning, if the language is clear and unambiguous. If the statute is ambiguous, we look to the pertinent legislative history, to related statutes, and other material bearing on the legislative intent. *Johnson v. Mayor & City Council of Baltimore City,* 387 Md. 1, 11–12, 874 A.2d 439, 445–46 (2005). We seek to avoid interpretations that are "illogical, unreasonable, or inconsistent with common sense." *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106, 112 (1994).

Here, the statute applicable to LLCs, CA § 4A–903, is ambiguous. Is there underlying power in all circuit courts to dissolve an LLC, with a legislatively expressed preference for exercise of that power by the court in the county of the LLC's principal office, or is that latter court the only one that is endowed with the power to dissolve? Asked another way, as to dissolutions of LLCs, is there no power lying dormant in all circuit courts, to be exercised, properly or improperly, when invoked in a particular case, but only a power, statutorily

conferred, that arises in a given action in a single circuit court, determined by the location of the principal office of the subject LLC?

 Finding the plain language inconclusive, we look to the aids for statutory construction. There is a presumption, usually applied to issues of fact, that courts of general jurisdiction have acted within their jurisdiction. *Brown v. State,* 169 Md.App. 442, 464–65, 901 A.2d 846, 849, *cert. denied,* 395 Md. 56, 909 A.2d 259 (2006); *In re Nahif A.,* 123 Md.App. 193, 717 A.2d 393 (1998), *overruled on other grounds, In re Antoine M.,* 394 Md. 491, 907 A.2d 158 (2006). Consequently, statutes are to be read as favoring subject matter jurisdiction, absent a clear intention of the legislature to limit it. *Sivilla v. Philips Med. Sys. of North America, Inc.,* 46 Conn.App. 699, 700 A.2d 1179, 1182 (1997). The legislative history of CA § 4A–903 fails to disclose any legislative intent to alter the subject matter jurisdiction of the circuit courts in the radical and unorthodox manner required by appellants' construction of the statute.

The judicial dissolution provision of the MLLCA traces to the Maryland Revised Uniform Limited Partnership Act (MRULPA) that, in turn, traces to the Maryland Uniform Partnership Act (MUPA), Code (1975), CA Title 9. The references to principal office in CA §§ 4A–903 and 904 were part of the MLLCA's original enactment by Chapter 536 of the Acts of 1992. Section 4A–901(a) of that act explains that dissolution of a limited liability company "is a change in the relationship between the members, not [its] winding up or termination[.]" The legislative bill that became the MLLCA was drafted for the General Assembly's consideration by a special joint committee of the Sections of Taxation and Business Law of the Maryland State Bar Association (the Committee). *See* D. Cohen et al., *Doing Business under the New Maryland Limited Liability Company Act* (The Maryland Institute for Continuing Professional Education of Lawyers, Inc. (1993)) at 66 (MICPEL). The Committee explained the

effect of "dissolution," as used in MLLCA § 4A–901, as follows:

"This section is similar to [CA] § 9–601.[5] Partnership law has long drawn a distinction between events which extinguish the authority of partners to continue to conduct the affairs of the partnership as a going concern and those which terminated the partnership itself. Extinguishing the authority to continue to conduct the affairs of the partnership as a going concern has historically been referred to as the dissolution of the partnership. Following dissolution, the partnership remains in existence in order to wind up its affairs. Only after the affairs have been wound up is the partnership itself terminated.

"On the other hand, in the corporate context, the term 'dissolution' generally is thought to refer to the termination of the existence of the entity. The existence of these two different meanings of the term 'dissolution' often creates confusion.

"The term 'dissolution' is so firmly entrenched in partnership law and has been accorded such great significance for federal income tax purposes that its continued use in this Act in the partnership sense is thought to be essential.

"Specifically, dissolution under subsection (A) means that the authority of the members under § 4A–401, or the authority of any other agent of the limited liability company, to continue to conduct the business as a going concern has ended. Following dissolution, unless the remaining members elect to continue the business under § 4A–904, the members must commence efforts to wind up and ultimately terminate the limited liability company."

MICPEL at 82–83.

Specifically with respect to judicial dissolution under CA § 4A–903, the Committee stated:

"This provision is derived from [CA] § 10–802.

---

**5.** The reference is to the former MUPA, Maryland Code (1975), CA § 9–601.

"It is generally intended that all circumstances which justify judicial dissolution under the Maryland Revised Uniform Limited Partnership Act will justify judicial dissolution of a limited liability company."

MICPEL at 84.

By Chapter 801 of the Acts of 1981, the General Assembly adopted the MRULPA, now codified as Title 10 of the CA Article. Subtitle 8 of the MRULPA addresses dissolution. It contains the provision under which "the circuit court of the county in which the principal office of the limited partnership is located may decree dissolution[.]" CA § 10–802. Chapter 801 of the Acts of 1981 adopted, and legislatively approved, comments following the statutory sections. The comment to CA § 10–802 reads:

"This section is new and is derived from § 9–603(a)(4) of this article, which is part of the Maryland Uniform Partnership Act. *It is not intended to modify existing law.* § 10–109(a)(3) of the previous Limited Partnership Act (§ 10 of the prior uniform law) also granted this right."

1981 Md. Laws at 3047 (emphasis added).

Prior to the enactment of the MRULPA by Chapter 801 of the Acts of 1981, the circuit courts of this State exercised fundamental jurisdiction to decree the dissolution of partnerships and to supervise the winding up of their affairs. *See, e.g., Metaxa v. Coutros,* 211 Md. 499, 128 A.2d 273 (1957); *Smith v. Smith,* 189 Md. 1, 53 A.2d 15 (1947); *Pritzker v. Stern,* 187 Md. 499, 51 A.2d 69 (1947); *Laddon v. Whittlesey,* 44 Md.App. 19, 408 A.2d 93 (1979). There is no indication in the MRULPA of an intent to alter the subject matter jurisdiction of the circuit courts.

The sections referenced in the Comment to CA § 10–802 are to the MUPA and to the predecessor Limited Partnership Act. Former CA (1975) § 9–603 of the MUPA, in relevant part, read:

" § 9–603. Dissolution by decree of court.

"(a) On application by or for a partner, the court shall decree a dissolution whenever:

. . . .

"(4) A partner willfully or persistently commits a breach of the partnership agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him[.]"

This provision was included in the enactment of the original MUPA by Chapter 175 of the Acts of 1916. The MUPA contained no limitation as to the circuit court in which a judicial dissolution could or should be ordered. Substantially the same provision as former CA § 9-603 is now found in the MRUPA, Code (2007), CA § 9A-801(5)(ii). The MRUPA likewise contains no limitation as to the court that may *order* a judicial dissolution of a partnership.

Section 10-109(a)(3) of the former MULPA is the other statute referred to in the legislative comment to the MRULPA's § 10-802. Former CA (1975), § 10-109(a)(3) provided that

"(a) a limited partner shall have the same rights as a general partner to:

. . . .

"(3) Have dissolution and winding up by decree of court."

The MULPA was enacted by Chapter 280 of the Acts of 1918 and, throughout its legal life, contained no language of limitation as to the court that may order dissolution of a limited partnership. *See* CA (1975), General Revisor's Note following § 10-129.

In sum, the legislative history reveals that the principal office provision was placed in the MLLCA because it was in the MRULPA, where it had been inserted with no intent to change prior law. Under prior law, the circuit courts had unrestricted subject matter jurisdiction to hear an action for the dissolution of partnerships. Consequently, it would seem that the draftpersons of the MRULPA, by inserting the reference to principal office in that statute, simply assumed that venue of an action to dissolve a limited partnership would always lie where its principal office was located.

Another statute that is related to the issue before us is Maryland Code (2007), CA § 3–413, dealing with involuntary dissolutions of corporations. It sets forth the grounds for involuntary corporate dissolution and requires a vote of twenty-five percent of the shares eligible to vote for directors in order to petition "a court of equity to dissolve the corporation[.]" There is no restriction as to the court entertaining the action, other than the general venue statute.

The history of the provisions for judicial dissolution of corporations bears significantly on the issue before us. Provisions for the judicial dissolution of corporations were broadened by Chapter 649 of the Acts of 1967, legislation that was presented to the General Assembly in the final report of the Commission on Revision of the Corporation Laws of Maryland, dated December 15, 1966. That Commission considered the then existing law "inadequate to deal with situations of deadlock, serious dissention and the like." Dec. 15, 1966 Report at 73. Prior thereto, Maryland Code (1957), Article 23, § 80(a) in relevant part read that any stockholder or creditor of an insolvent corporation "may petition any court having equity jurisdiction in the county in which is located the principal office of the corporation in this State, to dissolve the corporation." Chapter 649 of the Acts of 1967 amended former § 80 and enacted new provisions in new § 80A, reading in relevant part:

" § 80A. Venue; Receivers; and Certain Procedures

"(a) Any petition brought pursuant to §§ 79, 79A or 80 of this Article shall be brought in any court having equity jurisdiction in the county in which is located the principal office of the corporation in this State."

Maryland Code (1957, 1973 Repl.Vol.), Article 23, § 80A. The term "venue" in the catchline of § 80A was part of Senate Bill 8, enacted as Chapter 649. It is the General Assembly's characterization that the forum provision relates to venue as opposed to the catchline's being a description added by the codifier. See II 1967 Md. Laws at 1328.

Former Article 23, § 80A remained unchanged until Code Revision and the enactment of the Corporations and Associations Article by Chapter 311 of the Acts of 1975. Former Article 23, § 80A(a) was deleted. The Revisor's Note to CA (1975) § 3–416 advises: "The first sentence of former Article 23, § 80A(a), dealing with venue, is deleted since it is covered by CJ § 6–201." The reference is to the general venue statute, now Maryland Code (1974, 2006 Repl.Vol.), § 6–201 of the Courts and Judicial Proceedings Article.

■ We can discern no logical reason why the General Assembly would intend the reference to principal office in the former corporation law to be a venue provision, but intend that a similar reference to the principal office of a limited liability company in CA § 4A–903 to be a withdrawal of subject matter jurisdiction from all circuit courts, other than that in the county of the principal office of the LLC sought to be dissolved. Consequently, we hold that reference to the circuit court of the county of the principal office of the LLC in CA § 4A–903 is a venue provision.

■ For the reasons applicable to the LLC provision, we also hold that the similar reference in CA § 9A–803 to supervising the winding up of a general partnership is a venue provision.

## C. Discussion—Subject Matter Jurisdiction

In this Part I.C we shall assume, alternatively, that CA §§ 4A–903 and 9A–803 conferred subject matter jurisdiction to exercise the judicial power described therein solely on the Circuit Court for Montgomery County, with respect to Bay View and Spa. Even on that assumption, the statutes are not violated because it was the Circuit Court for Montgomery County that ordered the dissolution of Bay View and supervised the winding up of Spa by orders entered on March 20, 2007.

Appellants' argument seems to be that the statutes deprived the Circuit Court for Anne Arundel County of any subject matter jurisdiction even to hear testimony and find facts that

would support relief by way of involuntary dissolution or supervising winding up. The argument is based on the reference to "application" in the two statutes. Under CA § 4A–903, the court may decree dissolution of a LLC "[o]n application by or on behalf of a member[.]" Under CA § 9A–803, the court may order judicial supervision of the winding up of a partnership "on application of any partner, partner's legal representative, or transferee[.]" We disagree. These provisions do no more than identify the class whose members have standing to bring the action.

The point is illustrated by *Turner v. Flynn & Emrich Co. of Baltimore City*, 269 Md. 407, 306 A.2d 218 (1973). Code (1957, 1973 Repl.Vol.), Article 23, § 79A(b) provided that "[a]ny holder of shares entitled to vote at an election of directors of a corporation may petition a court of equity to dissolve the corporation" on certain grounds. Beneficiaries of a testamentary trust, that held legal title to shares in the subject corporation, sued to liquidate. The Court of Appeals held that beneficial owners were not embraced by the statute. The Court reasoned: "It is a generally recognized principle that absent extraordinary circumstances, without an enabling statute a court of chancery has no jurisdiction to decree the dissolution of a corporation on application of a shareholder and that when a statutory remedy is available, the complainant must bring himself within the express terms of the act." *Id.* at 410, 306 A.2d at 219 (citations omitted).[6]

■ Actions for judicial, involuntary dissolution of an LLC typically will involve allegations of breach of fiduciary duty, of breach of contract, and, possibly, of torts, including fraud. In the instant matter, Dyas did not seek a dissolution of Bay View until after the complaint had been pending in the Circuit

---

6. We read the court's use of the term, "jurisdiction," in *Turner* to mean a proper exercise of jurisdiction. The Court recognizes that, even absent a statute, there is subject matter jurisdiction. It should be exercised, however, only under "extraordinary circumstances." *See generally* Hornstein, *A Remedy for Corporate Abuse: Judicial Power to Wind Up a Corporation at the Suit of a Minority Shareholder*, 40 Colum. L.Rev. 220 (1940).

Court for Anne Arundel County for seventeen months. Under the appellants' theory, Dyas presumably should have filed his claim seeking dissolution of Bay View, not as a count in his third amended complaint, but as a separate action in the Circuit Court for Montgomery County. Ordinarily, Dyas would have been entitled to a stay of the dissolution action, pending resolution of his claims in Anne Arundel County. If he prevailed in the latter jurisdiction, issue preclusion could be the basis for an order of dissolution by the Circuit Court for Montgomery County in the separate action. By trying the issues in Anne Arundel County, and transferring the entire action to Montgomery County prior to the order of dissolution, Dyas has achieved the same result. There is no basis in CA § 4A–903 for requiring severance of a dissolution claim and precluding transfer of the action. That is not a commonsense application of the statute.

As recognized in CA § 9A–803, winding up of a partnership takes place only "[a]fter dissolution[.]" *See also* CA § 9A–802(a) ("[A] partnership continues after dissolution only for the purpose of winding up its business."). Here, the Circuit Court for Montgomery County ordered the dissolution of Spa and then supervised its winding up.

## II. DISSOCIATION

■ Appellants next contend that the trial court erred (1) by dissociating Della Ratta from Spa and (2) by enjoining his capital calls for Spa. The argument accepts the legal sufficiency of the evidence to support the court's factual findings. In their brief-in-chief, appellants contend that the court erroneously based the two forms of relief relating to Spa on conduct of the appellants that related to Bay View. Appellants posit that the court effected a de facto merger of the two separate entities under circumstances that did not permit piercing their "corporate" veils. We are unpersuaded by this exotic argument. The facts, as found by the trial court, are that the Developers themselves linked the two entities. In

any event, the conduct of Della Ratta, as a partner in Spa, supports the relief.

The trial court's overview was that

"the [Developers] had agreed to link the Bay View Condominiums LLC venture and the Spa Motel General Partnership business. They had agreed that the Spa Motel General Partnership would acquire the land for the condos and that the proceeds from the condos would go back and pay the operating losses of the [O]ld [H]otel."

Within Spa, the management of the two hotels was entrusted to Della Ratta's wholly owned company, CMC. Under the 1988 contract between Spa and CMC for the management of Sea Bay, CMC was to "utilize [the] latest revised edition, A UNIFORM SYSTEM OF ACCOUNTS FOR HOTELS[.]" There were to be monthly financial statements and, "[a]s additional support . . . a detailed analysis of expenditures and variances to Budget." Instead, Della Ratta's "accounting principle" was "taking money from wherever is necessary." The trial court was referring to Della Ratta's practice of disregarding entities and using cash in one of his holdings to meet a need in some other holding. Thus, CMC would request or issue checks that bore no notation of purpose, or merely noted "loan" or "advance." CMC "utterly failed to comply" with the accounting requirements of its management contract.

Against this background, Della Ratta issued the capital calls of December 10, 2004. Writing to Spa as President of CMC, Della Ratta claimed $1,485,650.04 in cash advances to Spa, including interest, for operating losses and CMC claimed $640,920, including interest, to be due on lease financing for furniture, fixtures, and equipment for the Old Hotel. Writing to Spa as president of DRI, Della Ratta claimed $1,439,110, including interest, for cash advances. Writing to Spa for his own account, Della Ratta claimed $1,967,030.97, including interest, for cash advances. Each claim demanded payment on or before January 14, 2005. Then, writing as general partner of Spa, Della Ratta called for capital by January 14, 2005, of

$5,532,711, of which Dyas's share would be $2,766,355.50. This is the "Old Money Call." In addition, Della Ratta claimed on behalf of Spa, payment by Dyas, by January 14, 2005, of $798,047.50, representing fifty percent of $1,596,095, the projected cost overrun on the New Hotel. Dyas was also requested to pay a total of $225,146.50 in monthly payments from December 2004 through April 2005 for projected cash requirements of the two hotels. These two demands are the "New Money Call."

The trial court expressly found that both of those calls "were issued in bad faith."

The trial court also found that, "[by] another improper accounting movement" in Spa, $580,000 was taken "for executive office expenses which was improper[.]"

This partial review of the unchallenged fact-findings relating to Della Ratta's activities while a partner in Spa is sufficient to demonstrate that dissociation from Spa and voiding of the capital calls was not based on Della Ratta's conduct as a member of Bay View. It also demonstrates satisfaction of the grounds for dissociation relied upon by the trial court, *i.e.*, that Della Ratta's conduct relating to Spa's business was such that it was "not reasonably practicable to carry on the business in partnership with [him]." CA § 9A–601(5)(iii).

In their reply brief, appellants appear to shift ground. They say that dissociating Della Ratta and voiding the calls was error because no more than sloppy bookkeeping was involved, and because Dyas "had no interest in documenting Mr. Della Ratta's many cash advances on Mr. Dyas' behalf." The defense seems to be in the nature of consent, waiver or estoppel. Appellants recognize that the clearly erroneous rule applies to the fact-findings of the trial court, yet, in support of their contention, they rely, *inter alia*, on portions of Dyas's testimony. We hold that, on the record as a whole, the asserted defense is not established as a matter of law.

### III. FIXED CONTRACT PRICE

Appellants next contend that the trial court erred by finding that the parties had formed an enforceable agreement to

construct the Maresol condominiums on a fixed price basis. There is no written construction contract to which we can turn for resolution of the issue.

Dyas contended that the contract between Bay View and DRI was at a fixed price, and he testified that that was his understanding. Della Ratta testified that the contract was a cost plus contract similar to the one between Spa and DRI for the construction of the Sea Bay Inn.[7] The trial court found that, as originally formed, the Maresol construction contract was at a fixed price of $4,585,825, which was increased by authorized change orders amounting to $1,027,613, for a final contract price of $5,613,438. Dyas proved, through numerous checks and a journal entry, that appellants had taken or received from Bay View, a cumulative total of $8,776,955.10, amounting to $3,163,517.13 more than that to which they were entitled. By an order of September 18, 2006, the trial judge, sitting as a judge of the Circuit Court for Montgomery County, ordered the appellants to return $3,163,517.13 to Bay View within seventy-two hours from the date of that order.

■ Characterizing their argument as presenting a question of law, appellants submit that there was insufficient evidence from which the trial court could find that an express contract for payment of a fixed price was formed between MRI and Bay View.[8] The evidence before the trial court was sufficient to support its finding of an express, oral contract to construct at a fixed price.

In January 2002, Bay View obtained a commitment from Severn Bank for a construction loan of $4,433,182. The commitment required that requests for withdrawals be completed

---

7. We were advised at oral argument that Della Rata's position is that the "plus" was ten percent.

8. Appellants' brief-in-chief quotes fully from the cross-examination of Dyas in which he acknowledged his concerns over increased costs. Appellants argue that this testimony is inconsistent with a fixed price contract. Dyas argues to us that Bay View's exposure to mechanic's liens explains the concern. This credibility issue was for the trial court as the (continued ... ) finder of fact.

on AIA Documents G–702 and G–703, the "Application and Certificate for Payment." Thereafter, DRI submitted twenty-two applications for payment on each of which the first item, "ORIGINAL CONTRACT SUM," bore the entry "$4,433,182." Each was signed on behalf of DRI by or for Joseph E. Brimmer (Brimmer), a high level employee of MRI.[9]

As changes in the design of Maresol were made, and at least one additional loan from Severn was obtained, DRI, through Brimmer, and Bay View, by Della Ratta, executed twelve change orders on AIA Document G–701–2000. Common to each of these change orders is the preprinted language which we quote below from change order No. 12, dated June 4, 2002, together with the amounts inserted in that change order's blanks.

"The original (Contract Sum) (Guaranteed Maximum Price) was $4,585,825.56

"The net change by previously authorized Change Orders *$966,180.34*

"The (Contract Sum) (Guaranteed Maximum Price) prior to this Change Order was *$5,552,005.90*

"The (Contract Sum) (Guaranteed Maximum Price) will be (increased) (decreased) (unchanged) by this Change Order in the amount of *$23,668.20*

"The new (Contract Sum) (Guaranteed Maximum Price) including this Change Order will be *$5,575,674.10*

"The Contract Time will be (increased) (decreased) (unchanged) by *ZERO* (0) days."

In making the finding disputed by appellants, the court relied principally on a letter dated August 6, 2002, from Della Ratta to Dyas, with copy to Brimmer, concerning Bay View. In relevant part, it reads:

---

**9.** Mr. Brimmer had no personal knowledge of the terms of the DRI–Bay View contract for the construction of Maresol. He was told by Della Ratta that it was a cost plus contract, but he had no recollection of ever hearing that from Dyas.

"As you know, we wanted to start this project with having the cost structure well contained, but we're off considerably from that objective. When we departed from our initial concept of 30 units of piggyback townhouses with known costs to an entirely new concept, we began a cost process which escalated dramatically when we decided to upgrade the product and go to 40 units. We started with a *fixed contract price* of $4,585,825 and approved changes that have increased our cost to an estimated final of $5,613,438. *These are costs that are the responsibility of Della Ratta, Inc.*"

(Emphasis added). When cross-examined at trial concerning the letter of August 6, 2002, Della Ratta replied that the letter "says what it says, but that is an error."

Appellants ask that this matter be remanded for the purpose of taking additional testimony to determine the costs to MRI of constructing Maresol or, under a *quantum meruit* theory, the reasonable value of those improvements. Appellants' position at trial was that the work was done under a cost plus contract, but they failed to convince the trier of fact who found, on sufficient evidence, an oral, express, fixed price contract. Appellants, at this time, may not switch theories and contend that there was no express contract. *See County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 101, 747 A.2d 600, 610 (2000) (holding that, generally, quasi-contract claims such as *quantum meruit* cannot be asserted when an express contract defining the rights and remedies of the parties exists).

We also observe that the court's finding is also consistent with Developers' arrangement for the construction of the New Hotel. DRI did that work under a written contract that set a fixed price. This observation segues into appellants' remaining argument.

## IV. DENIAL OF REOPENING

Appellants are aggrieved by the court's exclusion of an exhibit, consisting of twelve checks drawn on the CMC "In-

vestment Requirements" account. The proffer of those checks was made after the auditor had submitted his report and arose under the circumstances described below.

In its amended interlocutory judgment of August 4, 2006, the court referred the accounting between the Developers to an auditor, subject to certain directions. Among these was that "the auditor shall perform the accounting herein based solely limited [*sic*] on the documents and exhibits which were provided by the parties at trial and which constitute the record of this case[.]" As the court later explained, the purposes of this provision were to enable the parties reasonably to rely on discovery, to recognize that they generally should have no need to reopen, and to express a reluctance to the offer of new evidence, after a party had been "educated" at trial. Further, "the parties should be required to present all evidence to a single fact-finder, particularly where, as here, witness credibility and a pattern of conduct are involved." The August 4, 2006 order, however, did provide for suggestions from the auditor, or any party, for the auditor to consider other books and records and for the court to take additional evidence "if needed to properly state and settle the accounts between the parties[.]"

In his report, the auditor included a balance sheet for Spa as of December 31, 2005. It included among long-term liabilities two items to which appellants' argument is directed. These were "CMC Investment Loan/Suites $193,297.13" and "CMC Investment Loan/Sea Bay $330,913.66." These two amounts appeared on an unaudited financial statement of Spa, as of that date, that had been maintained among the business records of Spa. It had been introduced as Defendants' Exhibit H 18 at trial. There was no other evidence before the court-appointed auditor explaining these "liabilities."

In his report, the auditor included a section of "AC-COUNTS AS TO WHICH INSUFFICIENT DOCUMENTA-TION HAS BEEN PROVIDED TO DETERMINE THE NATURE OF THE TRANSACTIONS." Among these were

"all advances made by CMC to the Sea Bay Inn, the New Hotel and/or the Partnership."

Dyas excepted to the inclusion, *inter alia*, of the two amounts as liabilities of Spa to CMC. On January 18, 2007, appellants responded, asserting that supporting evidence was found in Exhibits H4–H 18. That same day appellants also moved to reopen the evidence, without proffering any particular evidence.

A hearing was held by the trial court on April 17, 2007, on all open motions. That day, appellants served on Dyas and presented to the court their proffer that certain checks be accepted in evidence as Defendants' Exhibit L26. Six of the checks comprising proffered Exhibit L26 totaled $330,913.66, and the other six checks totaled $193,297.13

At the hearing on the motion, appellants submitted that the account on which the twelve checks had been drawn was shown by uncontradicted testimony to be Della Ratta's personal checking account. They pointed out that the checks in proffered Exhibit L26 were part of a larger bundle of checks that had been produced in discovery and that had been pre-marked for trial as Exhibit C3. Appellants represented that when the court held that the construction contract for the New Hotel was a fixed price contract, counsel concluded that

"the checks that Joe Della Ratta wrote to fund in [*sic*] cost overruns thereby became [in]admissible. The problem I had in trial was that I didn't know how to pull the checks apart. I didn't know what checks were construction and what checks were[,] I'll call[,] hotel operations checks."

Appellants gave two reasons for not introducing proposed L26 at trial. First, they anticipated defeating the request for a permanent injunction of the "Old Money" capital calls of December 10, 2004, so that appellants would "get all the expenses for the hotels." Appellants said that their "fall back" was the law of actions for an accounting, under which evidence bearing on the accounting, as contrasted with the right to an accounting, is presented at the bifurcated stage before the auditor.

The printed form of the checks at issue contains, in the lower lefthand corner, the word, "MEMO," followed by a blank line. That line is filled in in longhand on each of the checks. Appellants argued that the memos were illegible but that the purpose of the checks could be explained by Della Ratta and by the vice president of CMC (both of whom had testified at trial).

As part of its written opinion of June 4, 2007, the court declined to reopen the evidence for the admission of L26, and related evidence. The court listed the checks, including its reading of the memos. That reading is a finding of fact and reflects that one of the checks was identified in the memos as capital construction for the New Hotel.[10]

In explaining its exclusion of L26, the trial court reviewed its problems with appellants' recordkeeping, accepted the argument of Dyas, and added additional reasoning. Despite CMC's contractual undertaking to utilize the most current uniform system of accounting for hotels, "the actual financial and accounting practices of Della Ratta and CMC ... constituted an accountant's nightmare[.]" There were no independent audits, "[m]uch back-up documentation was mislaid, if it had existed, even for critical full year summaries." (Footnote omitted). There were occasions when "partnership hotel funds were used to meet thousands of dollars of payroll expenses and taxes for a separate hotel owned by Della Ratta,

---

10. Set forth below is the court's listing.

| check # | date | memo | amount |
|---|---|---|---|
| 1) 1326 | 11/08/04 | Loan | $ 30,000 |
| 2) 1329 | 11/15/04 | Loan-Sea Bay Inn | $120,000 |
| 3) 1330 | 11/15/04 | Loan-BW Suites | $ 45,000 |
| 4) 1337 | 12/29/04 | Capital Constr.-BW Suites | $ 34,000 |
| 5) 1336 | 12/24/04 | Capital Constr.-Sea Bay Inn | $ 76,000 |
| 6) 1349 | 02/04/05 | Fund Oper. Losses-Sea Bay | $ 54,721.66 |
| 7) 1350 | 02/04/05 | Fund BW Suites-Operations | $ 21,889.13 |
| 8) 1356 | 03/11/05 | Capital Call-Sea Bay Inn | $ 28,192 |
| 9) 1357 | 03/04/05 | Capital Call-BW Suites Hotel | $ 23,608 |
| 10) 1360 | 03/25/05 | Sea Bay Inn | $ 22,000 |
| 11) 1361 | 03/25/05 | BW Suites | $ 16,800 |
| 12) 136? | 04/27/05 | Capital | $ 52,000 |

which had no legal connection to [Spa]." The court summed up by observing that "Della Ratta and his bookkeepers blamed each other for a cascade of undocumented transactions, leaving accounting chaos in their wake." The court's ultimate finding was that "the records were woefully incomplete, inaccurate and unreliable."

Dyas argued, and argues to us, that appellants made a tactical decision, with knowledge of the risks, and that they should not now be given a "second bite at the apple." Dyas points out that appellants' optimistic decision to pursue the Old Money capital call was made after the court, by a temporary restraining order that was extended, and by preliminary injunction, had enjoined appellants from taking any action in connection with the calls. Further, the tactical decision was made before trial had ended and before the court ordered accounting relief and specified the scope of the auditors' responsibility. Dyas further argued that the checks, to the extent their purposes are unsupported, may have been used to pay construction cost overruns and that the unattributed "loans" might have been intended as part of the squeeze out. To these reasons, we might add that it should have come as no surprise to the appellants that the trial court would rule that the contract for the construction of the New Hotel was a fixed price contract, inasmuch as that is what the written contract says.

In addition, the circuit court pointed out that items five and eight referred to " 'capital' and/or 'construction' of the Sea Bay Inn" when "in fact, there was no evidence of ongoing construction or capital improvement to the older, Sea Bay hotel in this period." This suggested to the court that the expenditures may have related to the New Hotel. Finding that there was no backup documentation, the court concluded that it was impossible for it to know the purposes of the disbursements, and it would not speculate. The memos as to seven of the checks were said to be "Delphically opaque as to their purposes." The court ruled that "the inferences must be drawn against [appellants] who had the obligation properly to keep the books."

Appellants argue that the trial court abused its discretion in excluding L26 because, under the reasoning of *Golub v. Cohen*, 138 Md.App. 508, 772 A.2d 880, *cert. denied*, 365 Md. 474, 781 A.2d 779 (2001), they could rely on producing additional evidence at the accounting phase of the proceeding, and the trial court had not ordered the restriction on evidence before the auditor until after the evidence before the court had closed. We disagree. First, appellants had agreed to Dyas's request for an accounting. Because the trial court in the case before us had delved deeply into the accounting and bookkeeping practices of appellants and had received extensive and detailed evidence, appellants could not reasonably expect that the court would authorize a hearing before the auditor at which would be presented the same types of arguments resolved by the court. Indeed, Maryland Rule 2–543(b) provides that, "[w]hen a matter is referred to an auditor, the order shall state the purpose and scope of the audit. The order may prescribe the manner in which the audit is to be conducted[.]"

■■■ The discretion that a court exercises to receive or reject additional evidence after trial is very broad. Indeed, until relatively recently, the rule was stated to be that no appeal would lie from such an exercise of discretion. *See Cooper v. Sacco*, 357 Md. 622, 638 n. 4, 745 A.2d 1074, 1082 n. 4 (explaining that the earlier formulation of the rule did not mean a lack of appellate jurisdiction, but "inferred" that obtaining an appellate reversal of such a ruling was "difficult"). Principal among the factors to be considered are whether the proffered evidence is "essential" to a party's case or "supplemental," *id.* at 638–39, 745 A.2d at 1082, whether a party will be improperly prejudiced, *id.* at 637, 745 A.2d at 1081, and whether the omission was inadvertent. *Id.* at 640, 745 A.2d at 1083. It has been said that "[w]hen, in the judgment of the chancellor, the ends of justice will be subserved" it is the court's "plain duty to allow further proof to come in." *Bradford v. Eutaw Savings Bank*, 186 Md. 127, 131, 46 A.2d 284, 286 (1946). Judge Cathell, writing for the Court in *Cooper*, concluded that

"most of the cases in Maryland that affirm the denial of a motion to reopen the case have dealt with motions to submit supplemental or needless evidence, or evidence that this Court, or the Court of Special Appeals, held had already been submitted through alternative means."

*Cooper*, 357 Md. at 642, 745 A.2d at 1084.

Here, the asserted liabilities of Spa to CMC were already in evidence in the form of a balance sheet prepared for Spa by Della Ratta's accounting personnel. Appellants sought to bolster those line items by the checks comprising L26. The coincidence between the balance sheet items and the totals of subsets of checks in L26 does not make the trial court's ruling arbitrary. Appellants failed to persuade the trial court that the memos on those checks had any greater reliability than the "Dephlic" memos the court had rejected when presented with other exhibits from appellants' business records. Re-opening the case to admit L26 and supporting testimony would simply rehash the same issues of credibility on which the court had previously ruled.

We find no abuse of discretion in declining to reopen the proceedings in order to admit L26.

## CONCLUSION

For all the foregoing reasons, the judgment of the Circuit Court for Montgomery County, and the included interlocutory judgments of the Circuit Court for Anne Arundel County, are affirmed.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY THE APPELLANTS.**