996 A.2d 382

**Joseph M. DELLA RATTA, et al.**

v.

**Edward J. DYAS, Jr.**

No. 23, Sept. Term, 2009.

Court of Appeals of Maryland.

June 9, 2010.

558

James E. Carbine (James E. Carbine, P.C. of Baltimore, MD), on brief, for petitioners.

David M. Sheehan (Michael E. Blumenfeld of Brown & Sheehan, LLP of Baltimore, MD), on brief, for respondent.

Argued before *BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

ADKINS, J.

This case requires us to determine whether, with respect to the dissolution and winding up of a LLC and the winding up of a partnership, the "principal office" clause in Sections 4A–903, 4A–904(b) and 9A–803(a) of the Corporations and Associations Article ("CA") restricts subject matter jurisdiction to the circuit court of the county in which the principal office of the business entity is located. Specifically, Petitioner Della Ratta argues that the Circuit Court for Montgomery County's orders dissolving his partnership and LLC are invalid because the original petition for dissolution was filed in the Circuit Court for Anne Arundel County, a tribunal that lacked subject matter jurisdiction over the issue. We hold that the statutes limit subject matter jurisdiction for ordering dissolution to the particular county where the principal office is located. Nevertheless, the Circuit Court for Anne Arundel County had jurisdiction over the other counts in the complaint filed by Respondent Dyas, and jurisdictional problems with the claim for dissolution were avoided when the case was transferred to

---

* Bell, C.J., participated in the hearing and conference of this case, but recused himself prior to the adoption of this opinion.

the Circuit Court for Montgomery County before entry of judgment on the dissolution and winding up claims.

Della Ratta also appeals the trial court's decision to dissociate him from his partnership with Dyas, its exclusion of an accounting exhibit during the winding up phase of the action, and its finding that the parties entered into a fixed price contract for the construction of a hotel. The Court of Special Appeals ("CSA") held that sufficient evidence existed to support the trial court's conclusions, and affirmed the judgment of the lower court. We agree, and therefore affirm the judgment of the intermediate appellate court.

## FACTS AND LEGAL PROCEEDINGS

This dispute follows the disintegration of a twenty-year business relationship between Joseph M. Della Ratta and Edward J. Dyas. Dyas alleges that Della Ratta swindled him throughout the course of their collaboration to build three Ocean City resorts: the Best Western Sea Bay Inn, completed in 1988 ("Sea Bay"); the Maresol Condominiums, in 2004 ("Maresol"); and the Best Western Hotel and Suites, finished in 2006 ("the New Hotel"). Dyas further alleges that in 2004, Della Ratta attempted to "wrongfully squeeze out" Dyas from the partnership by maliciously calling in Dyas' indebtedness to the entities that the two developers formed for the projects.

Dyas and Della Ratta formed both a partnership—Spa Motel General Partnership [1] ("Spa GP")—in 1987 and a limited liability company—Bay View Condominiums, LLC ("Bay View")—in 2002. The two men utilized the partnership for the construction of both Sea Bay and the New Hotel, while opting for the LLC when commencing Maresol.[2]

---

**1.** Spa GP originally consisted of three partners, but during the course of the Sea Bay project, Dyas bought out the third partner. Thereafter, Dyas and Della Ratta each held a fifty percent interest in the partnership.

**2.** The parties' choices of business entities dictate which statutory regime is implicated in analyzing the judicially supervised dissolution of their business relationship. Sections 4A–903 and 4A–904(b) of the

Marked differences between the accounting practices of both men contributed to the downfall of their partnership. Dyas always created a new LLC for each of his projects in order to protect himself from liability if the job went bad. Also, Dyas preferred bank financing as much as that was possible. Della Ratta, on the other hand, had a more "loose" accounting practice whereby "he freely transferred money back and forth between [his own two corporate entities] to meet construction costs, overrun, et cetera." One of his corporate entities, a construction company called Della Ratta, Inc. ("DRI"), provided construction for all three projects. Moreover, the two hotels were managed by Commercial Management Company ("CMC"), also solely owned by Della Ratta. When Sea Bay's opening was delayed because it could not acquire financing for furniture, fixtures, and equipment, Della Ratta provided a loan from CMC to cover the leasing of those items. The terms of that loan were very favorable to CMC, and Dyas cites this as the first in a series of instances in which Della Ratta (in favoring his own interests) systematically fleeced him.

Later, in the Maresol project, Dyas and Della Ratta could not agree as to how to spend Bay View's newly acquired revenue following the sale of forty condominiums. Dyas disagreed with Della Ratta's desire to use the money to pay off a bank loan because the loan was not yet in default. Dyas alleges that Della Ratta then deceptively and unilaterally disposed of Bay View's funds to repay the loan and then attempted to force Dyas out of the partnership by seeking an assignment of the loan documents in order to foreclose on Dyas.

The last straw for Dyas came during the construction of the New Hotel in December 2004, when Della Ratta issued three "capital call letters" to Dyas, demanding repayment of costs

---

Corporations and Associations Article govern Bay View, while Sections 9A–801 and 9A–803(a) of that same article govern Spa GP. *See* Md.Code (1975, 1999 Repl. Vol.) §§ 4A–903 & 9A–803 of the Corporations and Associations Article ("CA").

associated with Sea Bay and the New Hotel, as well as other cash advances purportedly made by Della Ratta. On January, 10, 2005, Dyas filed a complaint in the Circuit Court for Anne Arundel County, seeking a temporary restraining order invalidating Della Ratta's three capital call letters. On February 9, 2005, Dyas amended his complaint, requesting judicially supervised dissolution of Spa GP.

On November 3, 2005, Della Ratta moved to transfer the case to the Circuit Court for Montgomery County, arguing that Section 9A–803(a) of the Revised Uniform Partnership Act[3] conferred exclusive jurisdiction over the dissolution action on Montgomery County because Spa GP's principal office was located in that county. *See* Md.Code (1975, 1999 Repl. Vol.) § 9A–803(a) of the Corporations and Associations Article ("CA").[4] Dyas responded by filing a third amended complaint, in which he requested judicial dissolution of Bay View under CA Section 4A–903. Della Ratta also challenged the court's ability to hear this dissolution matter, articulating the same subject matter jurisdiction argument he presented in defense against the dissolution of Spa GP.

Despite Della Ratta's protests, the Circuit Court for Anne Arundel County held a ten-day trial on the merits. After a bench trial, Judge Caroom ruled in favor of Dyas, enjoining Della Ratta's capital calls and appointing an auditor to inspect the accounts of Dyas and Della Ratta with respect to Spa GP and Bay View. The judge determined that Della Ratta's conduct prevented the partnership from continuing in a reasonably practicable manner, and therefore ordered Della Ratta dissociated from Spa GP pursuant to CA Section 9A–601(5)(iii), but reserved the actual order for dissolution of Spa GP and Bay View LLC pending the transfer of the case to Montgomery County. On June 23, 2006, Chief Judge Bell,

---

**3.** CA's Title 9A is designated as the Maryland Revised Uniform Partnership Act.

**4.** Unless otherwise specified, all citations to the Corporations and Associations Article are to the 1999 Replacement Volume, which was controlling law during the events of this case.

pursuant to Article IV, Section 18 of the Constitution of Maryland,[5] specially designated Judge Caroom to sit as a Judge of the Circuit Court for Montgomery County in this case and thereafter to render a verdict. Sitting in that capacity, Judge Caroom officially ordered the dissolution of Spa GP and Bay View and instructed Della Ratta to return over three million dollars to Bay View before the dissolution.

Following the trial on the merits, the dispute crossed into its accounting phase, during which the auditor prepared a statement of the accounts of both entities. During this phase, on April 17, 2007, the trial court held a hearing on all open motions. At the hearing, Della Ratta sought to introduce into evidence Defendant's Exhibit L26, which comprised twelve checks made payable to Spa GP and signed by Della Ratta. The trial court declined to reopen the evidence for the admission of L26, finding that Della Ratta's accounting practices rendered "the records [ ] woefully incomplete, inaccurate and unreliable." After two interim accounts and distributions, the auditor submitted his final report, which was approved by final judgment.

Della Ratta appealed the trial court's final judgment, and, in *Della Ratta v. Dyas*, 183 Md.App. 344, 961 A.2d 629 (2008), the CSA affirmed. Della Ratta then filed a timely petition for writ of certiorari to this Court, and we granted his petition to consider the following issues:

I. Did the Trial Court have the subject matter jurisdiction to dissolve Bay View and judicially supervise the winding up of Spa GP?

II. Did the Trial Court err in dissociating Della Ratta as a general partner of Spa GP based on his conduct in Bay View?

---

**5.** Article IV, Section 18(b)(2) of the Constitution of Maryland provides in relevant part:

[T]he Chief Judge of the Court of Appeals may, in case of a vacancy, or of the illness, disqualification or other absence of a judge or for the purpose of relieving an accumulation of business in any court assign any judge except a judge of the Orphans' Court to sit temporarily in any court except an Orphans' Court.

III. Did the Trial Court err in refusing to allow Della Ratta the opportunity to introduce proffered exhibit L26 into the record before the court appointed auditor during the accounting phase of the case?

IV. Did the lower courts err when they found that the parties formed an enforceable agreement to construct the Maresol Condominiums on a firm, fixed price basis?

## DISCUSSION

### I. Standard of Review

Pursuant to Maryland Rule 8–131(c), where, as here, an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. We will not set aside the judgment of the trial court on the evidence unless clearly erroneous. Md. Rule 8–131(c). "The appellate court must consider evidence produced at the trial in a light most favorable to the prevailing party...." *Ryan v. Thurston,* 276 Md. 390, 392, 347 A.2d 834, 835 (1975). "If there is any competent evidence to support the factual findings below, those findings cannot be held to be clearly erroneous." *Solomon v. Solomon,* 383 Md. 176, 202, 857 A.2d 1109, 1123 (2004) (quotation marks and citation omitted). The trial court's conclusions of law, however, are not entitled to the deference of the clearly erroneous standard. *See Clancy v. King,* 405 Md. 541, 554, 954 A.2d 1092, 1099 (2008).

### II. Analysis

#### A. *Subject Matter Jurisdiction vs. Venue*

Della Ratta argues that the Circuit Court for Anne Arundel County did not have the subject matter jurisdiction to dissolve Bay View and to supervise the winding up of Spa GP. Specifically, Della Ratta focuses on language found in three sections of the Corporations and Associations Article describing the appropriate arbiter for such matters, i.e., "the circuit court of the county in which the principal office of the partnership is located[.]" [6] He argues that Dyas's claims for dissolution and

---

6. CA Section 4A–903 (judicial dissolution of LLC) provides:

wind up of both Spa GP and Bay View were inappropriately submitted to and heard by the wrong court because Montgomery County is, indisputably, the location of the principal place of business for both entities.

### 1. Statutory Interpretation

The cardinal rule of statutory interpretation is to ascertain and effectuate legislative intent. *See Johnson v. Mayor & City Council of Balt. City*, 387 Md. 1, 11, 874 A.2d 439, 445 (2005). "The first step in determining legislative intent is to look at the statutory language and if the words of the statute, construed according to their common and every-

---

On application by or on behalf of a member, the circuit court of the county in which the principal office of the limited liability company is located may decree the dissolution of the limited liability company whenever it is not reasonably practicable to carry on the business in conformity with the articles of organization or the operating agreement.

CA Section 4A–904 (winding up of LLC) provides:

(a) *In general.*—Unless otherwise provided in the articles of organization or the operating agreement, the remaining members of a limited liability company may wind up the affairs of the limited liability company.

(b) *Judicial winding up.*—Notwithstanding the provisions of subsection (a) of this section, the circuit court of the county in which the principal office of the limited liability company is located, on cause shown after dissolution, may wind up the limited liability company's affairs on application of any member.

CA Section 9A–803 (winding up of partnership) provides:

(a) *Participation and supervision.*—After dissolution, a partner who has not wrongfully dissociated may participate in winding up the partnership's business, but on application of any partner, partner's legal representative, or transferee, the circuit court for the county in which the principal office of the partnership is located, for good cause shown, may order judicial supervision of the winding up.

(b) *Legal representative may participate.*—The legal representative of the last surviving partner may wind up a partnership's business.

(c) *Authority of person winding up.*—A person winding up a partnership's business may preserve the partnership business or property as a going concern for a reasonable time, prosecute and defend actions and proceedings, whether civil, criminal, or administrative, settle and close the partnership's business, dispose of and transfer the partnership's property, discharge the partnership's liabilities, distribute the assets of the partnership pursuant to § 9A–807 of this subtitle, settle disputes by mediation or arbitration, and perform other necessary acts.

day meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written." *Id.* (quotation marks and citations omitted). If, however, the statute is ambiguous, the court may supplement its analysis by turning to legislative materials, such as "related statutes, pertinent legislative history and other material that fairly bears on the ... fundamental issue of legislative purpose or goal...." *Id.* at 12, 874 A.2d at 446 (quotation marks and citations omitted). Throughout this process, this Court "must always be cognizant of the fundamental principle that statutory construction is approached from a 'commonsensical' perspective. Thus, we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106, 112 (1994) (citations omitted).

### 2. *Dissolution and Wind Up of Spa GP*

Della Ratta concedes that any court can order the dissolution of a partnership. CA Section 9A–801 provides in pertinent part:

A partnership is dissolved, and its business must be wound up, only upon the occurrence of any of the following events: ... (5) On application by a partner, *a judicial determination* that: ... [it is not reasonably practicable to carry on the business of the partnership].

(emphasis added). Here, there is no question that the General Assembly did not restrict which court could make the "judicial determination" of whether dissolution of a partnership is appropriate and render an order accordingly. Thus, the Circuit Court for Anne Arundel County possessed the subject matter jurisdiction to hear the dissolution count for Spa GP and would have been able to issue the final order of dissolution rather than transfer the matter to the Circuit Court for Montgomery County.

Della Ratta instead challenges the validity of the order for the wind up of Spa GP on grounds that the application requesting wind up was made in the Circuit Court for Anne

Arundel County when it should have been made in Montgomery County. There is no dispute that the Circuit Court for Montgomery County supervised the wind up of Spa GP, but Della Ratta asserts that the language of CA Section 9A–803 ("on application of any partner, ... the circuit court for the county in which the principal office of the partnership is located ... may order judicial supervision of the winding up") required Dyas to *file* his application for wind up in Montgomery County. Judge Rodowsky, writing for the CSA, rejected this argument, stating that the use of "application" in the statute was meant to refer to the class of persons who can request judicial supervision of the winding up process, rather than to limit the filing of an application to a specific court. *Della Ratta v. Dyas,* 183 Md.App. 344, 363, 961 A.2d 629, 640 (2008). We agree.

The statute permits an order for judicial supervision of winding up of a partnership "on application *of* any partner, partner's legal representative, or transferee...." CA § 9A–803 (emphasis added). The General Assembly could have, but did not, describe the petition for judicial supervision as an "application *to* the circuit court for the county in which the principal office of the partnership is located." Instead, the General Assembly coupled the word "application" with "of a partner, [etc.]," indicating its intention to regulate who would have standing to make such an application, not the place where persons with standing could file such an application.

 The CSA also rejected Della Ratta's challenge to the order for wind up of Spa GP on the grounds that requiring severance of Dyas's dissolution actions from his other twelve claims would not be a commonsense application of the statute. *Della Ratta,* 183 Md.App. at 364, 961 A.2d at 641. It noted that actions for involuntary dissolution are often linked to claims of breach of fiduciary duty, breach of contract, and possibly fraud. *Id.* As Dyas did not seek dissolution of Spa GP until after he had filed his other claims in Anne Arundel County, Della Ratta's theory would require Dyas to file a separate claim for dissolution in Montgomery County rather

than attaching the count onto his third amended complaint in Anne Arundel County. *Id.* at 364, 961 A.2d at 640 ("Ordinarily, Dyas would have been entitled to a stay of the dissolution action, pending resolution of his claims in Anne Arundel County."). If Dyas had been successful on his other claims (as he was here), collateral estoppel would lead to an order of dissolution in Montgomery County. "By trying the issues in Anne Arundel County, and transferring the entire action to Montgomery County prior to the order of dissolution, Dyas has achieved the same result." *Id.* at 364, 961 A.2d at 641.

Again, we agree with the CSA.

### 3. Dissolution and Wind Up of Bay View, LLC

 To contest both the dissolution and the winding up of Bay View,[7] Della Ratta focuses on the General Assembly's authorization of "the circuit court of the county in which the principal office of the limited liability company is located" both to decree the dissolution of an LLC (under CA Section 4A–903) and to wind up the affairs of the LLC (under CA Section 4A–904(b)).[8] Della Ratta claims that the statute is unambiguous and requires any adjudication of dissolution to be in the county described. The CSA disagreed, reasoning that the statute was ambiguous because it was unclear as to whether the language restricted jurisdiction to a specific county or simply indicated a non-binding preference for a particular county. We disagree with the CSA, however, because, in our view, such a holding contravenes the statutory interpretation

---

**7.** Della Ratta also presents the same "application" argument that he advanced in support of his interpretation of the partnership statute. This is refuted by the logic articulated in the Section II.A.2., and thus, we do not address it here anew.

**8.** Although Della Ratta claims that the judicial wind up of Bay View LLC was erroneous, he does not put forth any argument as to why. He claims that "[t]he trial court did not have the subject matter jurisdiction to ... supervise the winding up of the partnership [and Bay View LLC,]" even though it was the Circuit Court for Montgomery County that supervised the winding up. His discussion of Bay View LLC centers on its dissolution. Thus, we will focus on subject matter jurisdiction as it relates to CA Section 4A–903.

canon that a court should read a statute "as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Addison v. Lochearn Nursing Home, LLC,* 411 Md. 251, 275, 983 A.2d 138, 153 (2009) (quotation marks and citation omitted). Reading the language as a mere preference for a particular county would render it surplusage because, pursuant to the "carries on a regular business" clause in the Maryland's general venue statute,[9] venue would exist in the county where the principal office is located regardless of the existence of the "principal office" provision. Furthermore, such a reading would render the provision nugatory because a plaintiff could ignore the preference and bring a dissolution action in any county permitted by the general venue statute. *See* Maryland Code (1974, 2006 Repl. Vol.), § 6–201 of the Courts and Judicial Proceedings Article. Accordingly, because this Court should not read any portion of the statute as ineffectual, we do not interpret Section 4A–903 as signaling simply a "legislative preference." Thus, we conclude that the statute confers exclusive subject matter jurisdiction for ordering dissolution of an LLC on the county where the principal office of the LLC is located.

Even if this Court were to agree with the CSA that Section 4A–903 is ambiguous, we would still interpret the statute as we did above because of its legislative and statutory history. Again, we disagree with the CSA on this point. The CSA explored the legislative history of the Maryland Limited Liability Company Act ("MLLCA") (CA Title 4A), the Maryland Uniform Partnership Act ("MUPA") (CA Title 9), the Maryland Revised Uniform Partnership Act ("MRUPA") (CA Title 9A), and the Maryland Revised Uniform Limited Partnership

---

**9.** Maryland Code (1974, 2006 Repl. Vol.), Section 6–201 of the Courts and Judicial Proceedings Article provides in relevant part:

(a) *Civil Actions.*—... [A] civil action shall be brought in a county where the defendant resides, carries on a regular business, is employed, or habitually engages in a vocation. In addition, a corporation also may be sued where it maintains its principal offices in the State.

Act ("MRULPA") (CA Title 10). According to a special Joint Committee of the Sections of Taxation and Business Law of the Maryland State Bar Association ("the Committee"), which drafted the legislative bill that became the MLLCA, CA Section 4A–903 was derived from MRULPA's Section 10–802, and it was "intended that all circumstances which justify judicial dissolution under [MRULPA] will justify judicial dissolution of a limited liability company." *Draft of Third Report of the Special Joint Committee on the Maryland Limited Liability Company Act* 84 (1992).

Both CA Sections 4A–903 and 10–802[10] contain the "principal office" provision, and the CSA relied on the Committee's statement in holding that the MLLCA dissolution section contained the provision simply because it was in the MRULPA. *See Della Ratta,* 183 Md.App. at 360, 961 A.2d at 638–39. The comment to CA Section 10–802 (found in Chapter 801 of the Acts of 1981) explains that the Section is derived from CA Section 9–603(a)(4) of MUPA and "is not intended to modify existing law." 1981 *Md. Laws* 3047. Section 9–603(a)(4) does not contain the "principal office" provision.[11] Therefore, the CSA reasoned, the language in Section 4A–903 does not limit subject matter jurisdiction because its statutory genesis did not restrict which courts could order the dissolution of a partnership.

---

**10.** CA Section 10–802 provides: "On application by or for a partner, the circuit court of the county in which the principal office of the limited partnership is located may decree dissolution of a limited partnership whenever it is not reasonably practicable to carry on the business in conformity with the partnership agreement."

**11.** CA Section 9–603 reads in part:

Dissolution by decree of court.

(a) *Application by or for a partner.*—On application by or for a partner, the court shall decree a dissolution whenever:

\* \* \*

(4) A partner willfully or persistently commits a breach of the partnership agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him[.]

We agree with Della Ratta's challenge to the CSA's reliance on the Committee's stated intention not to modify the law as it existed before the adoption of CA Section 10–802. Relying on the Third Report of the Special Joint Committee on the Maryland Limited Liability Company Act (June 1, 1992), Della Ratta asserts that the intent was only to "borrow the 'circumstances which justify judicial dissolution' from the [MRULPA,]" not the law on subject matter jurisdiction. We believe this is the best reading of the comment. The General Assembly's insertion of language restricting the court that may order dissolution in the MLLCA and the MRULPA, while omitting the same language in MRUPA's dissolution statute, indicates that Maryland's legislative body intended to impose an additional limitation. There is no question that the General Assembly considered such language when it promulgated the MRUPA because the clause is present in the MRUPA's winding up statute. Thus, we conclude that the deviation is intentional and a more substantive restriction on subject matter jurisdiction.

Ultimately, the plain language of CA Section 4A–903 as well as a logical examination of legislative and statutory history persuades us that the MLLCA accords subject matter jurisdiction exclusively in the circuit court of the county in which the principal office of the LLC is located.[12] We also read the

---

12. At least one other state has interpreted an almost identical statute as limiting subject matter jurisdiction to a specific court. In *Andrews v. Andrews*, 895 So.2d 898, 900 (Ala.2004), the Supreme Court of Alabama interpreted Section 10–12–38 of the Alabama Limited Liability Company Act, which provides:

> On application by or for a member, the circuit court for the county in which the articles of organization are filed may decree dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with the articles of organization or operating agreement.

Without providing an in-depth analysis of the statute, the court simply stated that the court in the county where the articles of organization were filed had exclusive jurisdiction to hear any dissolution action. *Id.* Thus, it concluded that the trial court, which was located in a separate county, was correct in dismissing the defendant's claim seeking dissolution. *Id.*

same restriction in the plain language of CA Sections 4A–904(b) and 9A–803.

### 4. Transfer of the Action

■ Although, as we explained above, the MLLC and the MRUPA restrict subject matter jurisdiction of this action to the Circuit Court for Montgomery County, the trial court's transfer of the case to that circuit court and Judge Caroom's special designation as a judge of that court cured the jurisdictional problem. Judge Caroom, sitting as a judge for the Circuit Court for Anne Arundel County, made findings regarding the appropriate relief on all fourteen counts presented by Dyas. At that time, he found that the evidence indicated that Dyas and Della Ratta could not reasonably carry on with Bay View LLC and thus dissolution was warranted. Judge Caroom, however, was very careful to explain that the judgement of dissolution was not final because Anne Arundel County did not have the jurisdiction to adjudicate the matter:

> I find that the facts are sufficient for the Court to grant the dissolution but that I don't have the subject matter jurisdiction so the Court will transfer it to Montgomery County.
>
> And the Circuit Court there, unless there is something else presented to persuade it otherwise, in all likelihood would find that it might be appropriate to grant that relief.

Through an order dated June 23, 2006, Chief Judge Bell specially assigned Judge Caroom to sit as a Judge for the Circuit Court of Montgomery County. In his Amended Interlocutory Judgment issued from Anne Arundel County, Judge Caroom transferred the case to the Circuit Court for Montgomery County, effective August 7, 2006. On March 12, 2007, Judge Caroom, sitting specially as a judge of the Circuit Court for Montgomery County, ordered the dissolution of Spa GP and Bay View LLC.

To be sure, the mere transfer of a case for the formality of issuing an order will not comply with the dictates of CA Section 4A–903. Yet in this case, Judge Caroom did not close the dissolution matter before transferring it to Montgomery

County.[13] As the judge's statement indicates, Della Ratta would have had the opportunity to persuade him, when sitting as a judge of the Montgomery County Circuit Court, that the facts did not justify dissolution. According to the orders dissolving Spa GP and Bay View, the parties were able to advance their arguments during a February 28, 2007 telephone conference, and those arguments along with the applicable law and the record in the case prompted Judge Caroom to order dissolution.[14] During oral argument, Dyas conceded that no additional evidence was presented on dissolution once the case was transferred. Absent some proffer of additional evidence by Della Ratta, however, it was appropriate for Judge Caroom to rely on his findings regarding the other twelve counts in the Anne Arundel County case. Indeed, once the Anne Arundel County judgment became final, Della Ratta would be collaterally estopped from disputing the findings on the other twelve counts, and those issues could provide the necessary support for dissolution. The exercise of subject matter jurisdiction does not depend on the parties' decisions to submit additional evidence, but rather on whether the matter was adjudicated by the appropriate court. Thus, by providing the parties the chance to convince the Montgomery County court that dissolution was not necessary, Judge Caroom ensured that the order for dissolution did not violate the statutory restriction on subject matter jurisdiction. Accordingly, the

---

13. Litigants are strongly advised not to assume that a circuit court judge will be willing to follow the procedure that Judge Caroom adopted, including a request to be specially designated by the Chief Judge to sit in another county. Such decisions are purely discretionary.

14. This Court was not provided with a transcript of the February 28, 2007 telephone conference. Thus we are in the dark as to what arguments the parties actually presented during that hearing. We base our holding on Judge Caroom's verbal statement at trial that "something else [could be] presented to persuade [the Circuit Court for Montgomery County not to order dissolution]" along with his March 12, 2007 dissolution orders, which were issued "[u]pon consideration of . . . the arguments advanced by counsel during the February 28, 2007 telephone conference[.]"

Circuit Court made no error with respect to the dissolution and winding up of Spa GP and Bay View.

## B. Dissociation

██ Della Ratta also takes issue with the trial court's decision to dissociate him from Spa GP. He does not challenge the trial court's factual findings, but claims that the trial court erred by ordering his dissociation from the partnership based on his management of Bay View. He contends that the court inappropriately "pierce[d] the corporate veil" because it was

obvious that the trial judge was extremely upset about Mr. Della Ratta's diversion of Bay View cash to DR Palm Beach,[15] CMC, DRI and himself in repayment for advances they made to cover cost overruns on the construction of the Maresol condominiums . . . [as well as] Mr. Della Ratta's refusal to put Maresol's top floor units on the market.

As this is conduct associated with Bay View, Della Ratta asserts that it cannot serve as the basis for the trial court's decision and must be disregarded. The third ground for dissolution, according to Della Ratta, was his sloppy bookkeeping, which he insists is cancelled out by Dyas's neglect of his own duties. Della Ratta concludes that the nullification of these three reasons removes any grounds that could support the order of dissolution.

The trial court ordered Della Ratta's dissociation from Spa GP pursuant to CA Section 9A–601(5)(iii)[16] because it determined that Della Ratta's actions made it not reasonably

---

**15.** The record does not make clear the exact nature of the relationship between the parties and DR Palm Beach.

**16.** CA Section 9A–601 provides, in relevant part, that a partner is dissociated from a partnership upon the occurrence of any of the following events:

(5) On application by the partnership or another partner, the partner's expulsion by judicial determination because:

\* \* \*

(iii) The partner engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with the partner[.]

practicable to carry on the business in partnership with him. Della Ratta's wholly owned company, CMC, managed both the Sea Bay and the New Hotel, and CMC's vice president testified that the management company loaned $520,262 from the Sea Bay Operating Account to the New Hotel construction, in contravention of the management agreement between CMC and Spa GP. An additional violation of the agreement came in the form of numerous checks issued by CMC to Spa GP that "bore no notation of purpose, or merely noted 'loan' or 'advance.'" *Della Ratta,* 183 Md.App. at 365, 961 A.2d at 641. Finally, the parties stipulated that CMC violated its management contract when it improperly paid itself $580,000 for executive office expenses.

Even if the aforementioned incidents constituted nothing more than negligence, Della Ratta's capital calls of December 10, 2004 were, in fact, malicious. The CSA succinctly summarized the substance of the capital calls as follows:

Writing to Spa as President of CMC, Della Ratta claimed $1,485,650.04 in cash advances to Spa, including interest, for operating losses and CMC claimed $640,920, including interest, to be due on lease financing for furniture, fixtures, and equipment for [Sea Bay]. Writing to Spa as president of DRI, Della Ratta claimed $1,439,110, including interest, for cash advances. Writing to Spa for his own account, Della Ratta claimed $1,967,030.97, including interest, for cash advances. Each claim demanded payment on or before January 14, 2005. Then, writing as general partner of Spa, Della Ratta called for capital by January 14, 2005, of $5,532,711, of which Dyas's share would be $ 2,766,-355.50.... In addition, Della Ratta claimed on behalf of Spa, payment by Dyas, by January 14, 2005, of $798,047.50, representing fifty percent of $1,596,095, the projected cost overrun on the New Hotel. Dyas was also requested to pay a total of $225,146.50 in monthly payments from December 2004 through April 2005 for projected cash requirements of the two hotels. [One of these New Hotel capital calls was issued when the hotel was still under construction and had a stop work order due to DRI's failure to cure various defects found by the inspectors.]

*Della Ratta,* 183 Md.App. at 365–66, 961 A.2d at 641–42. The trial court found that the issuance of these capital calls occurred after Della Ratta had taken steps to deprive Bay View, and thus Dyas, of funds that would have been necessary to meet those obligations. Thus, the trial court concluded, the call letters were issued in bad faith. While Della Ratta surreptitiously emptied Bay View's accounts, it was to Spa GP that he issued the call letters at a time when he knew they could not be satisfied, in an attempt to squeeze out Dyas without following the proper legal procedures.[17]

In sum, the trial court's evidentiary support for dissociation related to Della Ratta's activities while a partner in Spa GP. The record contains sufficient evidence of Della Ratta's inappropriate conduct to support the trial court's conclusion that it was not reasonably practicable for Spa GP to continue with Della Ratta as a partner. Thus, the trial court did not err in ordering Della Ratta's dissociation from Spa GP.

## C. Accounting Exhibit

Della Ratta also seeks reversal of Judge Caroom's exclusion of an accounting exhibit ("L26") proffered by Della Ratta after the conclusion of the trial on the merits. After entering its Interlocutory Judgment, the trial court ordered an accounting of Della Ratta and Dyas's finances with respect to Spa Motel and Bay View and appointed an auditor. In its August 4, 2006 Amended Interlocutory Judgment, the court set forth the parameters by which the auditor was to conduct the accounting. One such guideline was that "the auditor shall perform the accounting herein based solely limited [sic] on the documents and exhibits which were provided by the parties at trial and which constitute the record of this case[.]" The trial court articulated two reasons for this restriction:

---

17. The trial court analogized Della Ratta's conduct to
the scenario of a dysfunctional family or a John Wayne western in which the angry father might say to the son "I brought you into this world and I can take you out of it." In effect, that's what Mr. Della Ratta was saying to Mr. Dyas: "I brought you into these construction projects and I can squeeze you out of them."

1) the parties to such complex litigation are entitled reasonably to rely upon the discovery process and, after the day of trial has come and gone, they generally should not be required to reopen the process when one party desires to offer new evidence with the benefit of the trial-date's and the judgment's education; and

2) the parties should be required to present all evidence to a single fact-finder, particularly where, as here, witness credibility and a pattern of conduct are involved.

The August 4, 2006 order did allow for the auditor to consider "other books and records" if the trial court determined that additional evidence or findings of fact were "needed to properly state and settle the accounts between the parties[.]" Maryland Rule 2–543(b) provides in relevant part that "[w]hen an matter is referred to an auditor, the order shall state the purpose and scope of the audit. The order may prescribe the manner in which the audit is to be conducted...." In accordance with Judge Caroom's directions in his referral to an auditor, the admission of additional evidence was within his discretion.

Under the parties's central management agreement, CMC was tasked with keeping the accounts. The agreement required CMC to, among other things, comport with the Uniform System of Accounts for Hotels and to furnish monthly reports of all transactions occurring within the month. Despite these guidelines, CMC and Della Ratta's actual accounting practices "constituted an accountant's nightmare[.]" For example, CMC ignored corporate boundaries when it used partnership hotel funds "to pay for dental insurance and HMO costs on the payroll of [DRI] with a note commenting 'Cyndy—Please adjust however you need to.'" CMC also used Spa GP's hotel funds to satisfy "thousands of dollars of payroll expenses and taxes for a separate hotel owned by Della Ratta, which had no legal connection to the partnership." Not surprisingly, an expert witness as to financial management practices for hotels testified that CMC's records were "grossly inadequate and failed to comply with the 'UNIFORM SYSTEM OF ACCOUNTING FOR HOTELS.'" The trial court

articulated the legal implications for a party who is responsible for managing the books and who fails to do so properly, in that it must "suffer from the inaccuracies and uncertainties in the evidence by having presumptions and inferences drawn against him or her for the failure to properly account." It was against this backdrop that the trial court supervised the accounting phase of the trial.

The CSA described the events of the accounting phase of the litigation:

> In his report, the auditor included a balance sheet for Spa as of December 31, 2005. It included among long-term liabilities two items to which [Della Ratta's] argument is directed. These were "CMC Investment Loan/Suites $193,297.13" and "CMC Investment Loan/Sea Bay $330,913.66." These two amounts appeared on an unaudited financial statement of Spa, as of that date, that had been maintained among the business records of Spa. It had been introduced as Defendants' Exhibit H18 at trial. There was no other evidence before the court-appointed auditor explaining these "liabilities."

> In his report, the auditor included a section of "ACCOUNTS AS TO WHICH INSUFFICIENT DOCUMENTATION HAS BEEN PROVIDED TO DETERMINE THE NATURE OF THE TRANSACTIONS." Among these were "all advances made by CMC to the Sea Bay Inn, the New Hotel and/or the Partnership."

> Dyas excepted to the inclusion, *inter alia,* of the two amounts as liabilities of Spa to CMC. On January 18, 2007, [Della Ratta] responded, asserting that supporting evidence was found in Exhibits H4–H18. That same day [Della Ratta] also moved to reopen the evidence, without proffering any particular evidence.

> A hearing was held by the trial court on April 17, 2007, on all open motions. That day, [Della Ratta] served on Dyas and presented to the court [his] proffer that certain checks be accepted in evidence as Defendants' Exhibit L26. Six of the checks comprising proffered Exhibit L26 totaled $330,913.66, and the other six checks totaled $193,297.13[.]

At the hearing on the motion, [Della Ratta] submitted that the account on which the twelve checks had been drawn was shown by uncontradicted testimony to be Della Ratta's personal checking account. [He] pointed out that the checks in proffered Exhibit L26 were part of a larger bundle of checks that had been produced in discovery and that had been pre-marked for trial as Exhibit C3. [Della Ratta] represented that when the court held that the construction contract for the New Hotel was a fixed price contract, counsel concluded that

> "the checks that Joe Della Ratta wrote to fund in [sic] cost overruns thereby became [in]admissible. The problem I had in trial was that I didn't know how to pull the checks apart. I didn't know what checks were construction and what checks were[,] I'll call[,] hotel operations checks."

*Della Ratta,* 183 Md.App. at 370–71, 961 A.2d at 644–45.[18]

The trial court refused Della Ratta's request to reopen the evidence for the admission of L26. The court questioned the purposes of the advances documented by the checks, which themselves gave no explanation for the amounts:

---

**18.** The court provided the contents of the twelve checks as follows:

| Check Number | Date | Memo | Amount |
|---|---|---|---|
| 1) 1326 | 11/08/04 | Loan | $ 30,000 |
| 2) 1329 | 11/15/04 | Loan – Sea Bay Inn | $120,000 |
| 3) 1330 | 11/15/04 | Loan – BW Suites | $ 45,000 |
| 4) 1337 | 12/29/04 | Capital Constr. – BW Suites | $ 34,000 |
| 5) 1336 | 12/24/04 | Capital Constr. – Sea Bay Inn | $ 76,000 |
| 6) 1349 | 02/04/05 | Fund Oper. Losses – Sea Bay | $ 54,721.66 |
| 7) 1350 | 02/04/05 | Fund BW Suites – Operations | $ 21,889.13 |
| 8) 1356 | 03/11/05 | Capital Call – Sea Bay Inn | $ 28,192 |
| 9) 1357 | 03/04/05 | Capital Call – BW Suites Hotel | $ 23,608 |

For example, items 5 & 8 refer to "capital" and/or "construction" of the Sea Bay Inn; in fact, there was no evidence of ongoing construction or capital improvement to the older, Sea Bay hotel in this period. Thus, these checks may have been intended for construction of the [New Hotel], for non-capital items (operating expenses?) at [Sea Bay], or a combination of each. Without any backup documentation, it is impossible for the Court to know and the Court properly cannot speculate. The same problems arise with items 1, 2, 3, 7, 10, 11 & 12 which are Delphically opaque as to their purposes. Again, the inferences must be drawn against the Defendants who had the obligation properly to keep the books.

These twelve checks were reminiscent of CMC's and Della Ratta's other accounting records, which the trial court characterized as "woefully incomplete, inaccurate and unreliable." The trial court acted within its discretion when it elected to exclude such untrustworthy evidence.[19] In sum, we see no error in the trial court's exclusion of L26.

## D. Fixed Price Contracts

Finally, Della Ratta appeals the trial court's finding that DRI entered into a verbal agreement with Bay View to

| 10) 1360 | 03/25/05 | Sea Bay Inn | $ 22,000 |
| 11) 1361 | 03/25/05 | BW Suites | $ 16,800 |
| 12) 136? | 04/27/05 | Capital | $ 52,000 |

See Della Ratta v. Dyas, 183 Md.App. 344, 372 n. 10, 961 A.2d 629, 645 n. 10 (2008).

**19.** To challenge the trial court's exclusion of L26, Della Ratta relies on Golub v. Cohen, 138 Md.App., 508, 772 A.2d 880, cert. denied, 365 Md. 474, 781 A.2d 779 (2001). Golub has no bearing on the trial court's decision to exclude additional evidence on the issue. It was a one-count suit for an accounting, and involved a dispute over whether a party could obtain discovery of financial information about the other party before the court determined that an account was due. See id. at 511, 772 A.2d at 882.

construct Maresol on a fixed price basis. He argues that the evidence indicates that the contract was actually a cost-plus contract. The absence of a written agreement required the trial court to construct the terms using letters between Dyas and Della Ratta, the testimony of both men, and various other company documents. The trial court found that the parties originally agreed upon a fixed price of $4,585,825, but increased that amount to $5,613,438 through authorized change orders. The trial court also found that the defendants received $3,163,517.13 in excess of the contract and ordered them to return that amount to Bay View.

 Della Ratta first challenges the trial court's conclusions by zeroing in on a misstatement made by the judge as he rendered his opinion from the bench. When examining an August 6, 2002 letter authored by Della Ratta, the trial court read part of one sentence as: "We started with a *fixed-price contract* . . . . " (emphasis added). The language Della Ratta actually used was: "We started with a *fixed contract price* . . . . " (emphasis added). We do not view the judge's inversion of "contract" and "price" as indicative of an inappropriate reading of the substance of the letter. Either version could reasonably lead a trier of fact to read Della Ratta's letter as acknowledging the existence of a contract that fixed a price at which DRI was to construct Bay View. Della Ratta's own testimony supports this interpretation. When asked about the letter, he did not attempt to deny that the statement referred to a fixed price contract, but rather simply characterized it as a clerical error. This supposed error extended to the next sentence in the letter, which explained that the increase in costs from $4,585,825 to 5,613,438 "are the responsibility of Della Ratta, Inc.[,]" instead of Bay View, as Della Ratta contends.[20]

---

20. These two sentences read: "We started with a fixed contract price of $4,585,825 and approved changes that have increased our cost to an estimated final of $5,613,438. These are costs that are the responsibility of Della Ratta, Inc."

The 2002 letter did not contain the sole clerical error in this case, as conceded by Della Ratta. During the construction of Maresol, Bay View obtained a loan from Severn Bank. Thereafter, DRI and Bay View executed twelve change orders, all of which were signed by Della Ratta and an agent of DRI. Each of these change orders listed $4,585,825.56 as the guaranteed maximum price, for example:

The original (Contract Sum)(Guaranteed Maximum Price) was $4,585,825.56.

The net change by previously authorized Change Orders $966,180.34

The (Contract Sum)(Guaranteed Maximum Price) prior to this Change Order was $5,552,005.90

The (Contract Sum)(Guaranteed Maximum Price) will be (increased) (decreased) (unchanged) by this Change Order in the amount of $23,668.20

The new (Contract Sum) (Guaranteed Maximum Price) including this Change Order will be $5,575,674.10

The Contract Time will be (increased) (decreased) (unchanged) by ZERO (0) days.

The alleged error in the language was authorized by Della Ratta a dozen times, yet it never came to his attention until trial. Ultimately, the trial court did not accept Della Ratta's argument and concluded that "references to fixed price contracts were not clerical errors, but they were actual expressions of the parties' understanding." The CSA supplemented the trial court's finding by observing that it was consistent with the parties's contemporaneous course of conduct where, after constructing Maresol, DRI also agreed to construct the New Hotel under a fixed price contract. *See Della Ratta,* 183 Md.App. at 369, 961 A.2d at 644.

 Della Ratta extensively quotes from his attorney's cross-examination of Dyas, arguing that Dyas's testimony conflicts with his argument for a fixed price contract. The trial court also considered this, but "[did not] find that the trial testimony or any other evidence overcame [the admission in the 2002 letter]." "Weighing the credibility of witnesses

and resolving any conflicts in the evidence are tasks proper for the fact finder." *State v. Smith*, 374 Md. 527, 533–34, 823 A.2d 664, 668 (2003) (quotation marks and citations omitted). As an appellate court, we do not re-weigh the evidence, but rather determine whether sufficient evidence exists to support the trial court's judgment. *Id.* at 534, 823 A.2d at 668. We believe that there was sufficient evidence to indicate that the parties entered into a fixed price contract and thus the trial court's findings were not clearly erroneous.

## CONCLUSION

We hold that, with respect to the dissolution and winding up of a LLC and the winding up of a partnership, the "principal office" clause in CA Sections 4A–903, 4A–904(b) and 9A–803(a) restricts subject matter jurisdiction to the county in which the principal office of the business entity is located. The Circuit Court complied with those statutes when, after adjudication of the multi-count action, it transferred the case to the Circuit Court for Montgomery County to adjudicate finally the requests for dissolution and winding up. Therefore, we affirm the court's final orders of dissolution and the winding up of Spa GP and Bay View. Additionally, we hold that the trial court did not abuse its discretion when it dissociated Della Ratta from the partnership or when it excluded exhibit L26 from consideration by the appointed accountant, and thus also affirm those decisions. Finally, we hold that the trial court's finding that the parties had entered into a fixed price contract to construct Maresol was supported by the evidence and thus is not a reversible error.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**